**STATE BANKING BOARD and Northline State Bank, Appellants,**

v.

**AIRLINE NATIONAL BANK, Appellee.**

No. 11365.

Court of Civil Appeals of Texas.

Austin.

Jan. 26, 1966.

Rehearing Denied Feb. 16, 1966.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., Paul W. Phy, John W. Fainter, Jr., Asst. Attys. Gen., Austin, Vinson, Elkins, Weems & Searls, Ben H. Rice, III, Ewing Werlein, Jr., Houston, Heath & Davis, Dudley D. McCalla, Austin, for appellants.

Joe R. Long, Brown, Sparks & Erwin, Frank C. Erwin, Jr., Austin, for appellee.

HUGHES, Justice.

The State Banking Board whose members are J. M. Falkner, Jesse James and Robert S. Strauss on November 25, 1964, granted a bank charter to the Northline State Bank of Houston, Texas, hereinafter called Northline. On December 3, 1964, the Airline National Bank of Houston, Texas, hereinafter called Airline, filed suit in the court below as an appeal from the order granting the bank charter to Northline. Only the State Banking Board and its members were made parties, however Northline intervened.

After a non-jury trial, the court made findings of fact and conclusions of

law upon which judgment was rendered[1] declaring null and void the charter issued by the Board to Northline.

The authority of the Board to issue charters for State banks is found in Art. 342–305, Vernon's Ann.Tex.Civ.St., which provides in part:

"In considering any such application, the State Banking Board shall, after hearing, determine whether or not:

1. A public necessity exists for the proposed bank.

2. The proposed capital structure is adequate.

3. The volume of business in the community where such proposed bank is to be established is such as to indicate profitable operation of the proposed bank.

4. The proposed officers and directors have sufficient banking experience, ability and standing to render success of the proposed bank probable.

5. The applicants are acting in good faith.

Should the State Banking Board determine any of the above issues adversely to the applicants, it shall reject the application. Otherwise such Board shall approve the application and the Commissioner shall, when the capital has been paid in cash, deliver to the incorporators a certified copy of the articles of association, and the bank shall come into corporate existence. Provided, however, that the State Banking Board may make its approval of any application conditional, and in such event shall set out such condition in the resolution granting the charter, and the Commissioner shall not deliver the certified copy of the articles of association until such condition has been met, after which the Commissioner shall in writing inform the State Banking Board as to compliance with such condition and delivery of the articles of association."

The Board made affirmative findings on each of these statutory requirements but it conditioned its approval of the application of Northline on an increase of $100,000.00 in the capital and surplus of the proposed bank.

Airline in its petition filed below alleged that each of the affirmative findings made by the Board was not reasonably supported by substantial evidence. Airline, however, has abandoned its attack on three of these findings and, in this Court, disputes only the finding that a public necessity exists for the proposed bank and the finding that the proposed officers and directors have sufficient banking experience, ability and standing to render success of the proposed bank probable.

We will first discuss and determine the question presented regarding the proposed officers of Northline.[2] The facts bearing on this question are these.

In the application for a charter for Northline it was stated:

"The proposed officers selected are: Executive officers to be named prior to opening, subject to approval of Banking Board. * * * President W. S. Elkins * * * Mr. W. S. Elkins, a life long resident of Houston and Senior Partner in the law firm of Vinson, Elkins, Weems and Searls, will serve as President, inactive, of the proposed bank. Mr. Elkins has been most active in business and civic affairs in Houston and is a member of the board of directors of five banks in the Houston area as listed below under the section dealing with directors.

1. This case was triable under the substantial evidence rule. Chemical Bank & Trust Company v. Falkner, 369 S.W. 2d 427, Tex. Supreme Court.

2. Airline concedes that the proposed *directors* are qualified.

Selection of an Executive Vice President, who will be the chief executive officer, and a Cashier have not been completed at this time. Assurance is given, however, that a fully competent management staff acceptable to the Banking Board and subject to its approval, will be named prior to opening for business. * * *

Mr. Elkins is a Senior Partner in Vinson, Elkins, Weems and Searls, one of Houston's oldest and largest law firms. He is an advisory director of the First City National Bank of Houston, and director of The Harrisburg Bank and Gulfgate State Bank of Houston, the LaPorte State Bank, and First State Bank of Clear Lake City."

The following testimony was given by Mr. John G. Heard, an attorney and director of Northline:

"Q (By Mr. Rice) Was there any statement made by a representative of the Airline Bank at the hearing with respect to the question of the management of the proposed Northline Bank?

A Yes, sir, there was such a statement.

Q Can you state for us, in substance or in exact words, if you can, what the statement was?

A There was such a statement, Mr. Rice, and as a matter of fact, the opponents to our charter admitted, through Mr. Jacobsen, that there was no question but what this group represented by the directors were responsible banking people and could provide necessary management, and I think almost his precise words were that there was no question but what this group could provide adequate banking management."

It is undisputed that the names of all the proposed officers of Northline were not submitted to the Board or any of its members prior to the hearing on the application for Northline or prior to entry of the order granting its application.

It is also undisputed that the order or resolution granting the application of Northline was not, in so many words, conditioned on the Board's approval of the proposed officers of the bank.

■ Since granting the application of Northline an organizational meeting was held by its stockholders and in addition to Mr. Elkins being named President, Mr. W. J. Keitt was named Vice President and Mr. Bernard S. Beaman, Jr. was named Cashier. These are the only officers a bank is required to have. Art. 342–409, V.A.T.S.

We do not understand Airline to question the qualifications of either Mr. Keitt or Mr. Beaman, Jr., but it does question the qualification of Mr. Elkins.

Mr. Elkins is an attorney, a member of a large Houston law firm. For twenty-five years he has devoted most of his time to banking matters for this firm. While he has never been an officer of a bank he has been a director and advisor of the First City National Bank of Houston since 1956, and has been a director of numerous other banks. Mr. Elkins did not intend to do the day to day work of the bank but he did intend to do all that was required of him by law as President of Northline.

■ We hold, with the trial court, that the qualifications of Mr. Elkins as an officer of Northline are established not only by substantial evidence, but by undisputed evidence.

The fact that the other two officers were not named until after approval of the application for a charter is said to be fatal to the validity of the charter.

■ While neither Airline nor the Board could waive the statutory requirements regarding the selection and Board approval of officers of a bank, the Board, as well as Northline, by the statement attributed to Mr. Jacobsen, were justified in believing

that the immediate appointment and Board approval of qualified officers was not a matter of present importance and was not a point of Airline's opposition to the issuance of a charter to Northline. Under these circumstances, we believe that the Board was not mandatorily required to approve the selection and qualifications of officers of the bank before approval of the charter [3] but that it could rely upon its authority in this respect given to it by Art. 342-307, V.A.C.S. This Article, a part of the banking code and to be construed with all of its provisions, including Art. 342-305, supra, provides, in part:

"No state bank may do business until it receives a certificate of authority from the Commissioner, which shall not be delivered until it has elected the officers and directors named in the application for charter or other officers and directors approved by the Commissioner; shall have adopted bylaws approved by the Commissioner; and shall have complied with all the other requirements of this Code relative to the incorporation of state banks."

This Article clearly contemplates a situation comparable to the one before us. If officers named in an application are not elected or if elected cannot or will not serve or if, as here, all the officers are not named in an application, then the statute provides an alternative. Willing officers and directors may be elected and when approved by the Commissioner, and not before, a certificate of authority to do business may be issued by the Commissioner to the new bank.

This construction of these statutes comports with ordinary corporate procedures and with the State Banking Code. Stockholders elect the directors who in turn elect officers. Arts. 342-404 through 342-409. There are no stockholders, directors or officers of a corporation until after the corporation is brought into being.

■ We are further of the opinion that the application of Northline expressed the condition that competent management would be named prior to the opening of the Bank for business and that the approval of this application by the Board had the legal effect of writing this condition into the charter as authorized by Art. 342-305, supra.

We turn now to the question of substantial evidence to support the finding of the Board that a public necessity exists for the creation of the Northline Bank. The wealth of material in the record on this phase of the case is staggering. We will do our utmost to condense it within reasonable limits and still perform our duty to consider the entire record in order to determine if this finding is reasonably supported by substantial evidence.

Northline was to be located in the City of Houston about five miles north of the central business district of Houston, at the southwest corner of an 80 acre tract occupied by Northline Shopping City, and on the North Freeway (Interstate 45, the Houston-Dallas Highway) at the Crosstimbers Road intersection.

Northline Shopping City is the only major regional shopping center in Harris County north of Buffalo Bayou and it is the largest such center in Houston. There is no bank in or on the premises of this Northline Center and there is no Houston bank on Interstate 45.

Northline Shopping City was planned and the 80-acre site was acquired in 1955, before construction of the North Freeway. Northline City opened in 1963. Its trade area encompasses all of Houston and Harris County north of Buffalo Bayou and the West Freeway (Katy Road). Its patrons were estimated at 60,000 per week. More than 1,200 persons are employed at Northline City.

3. It is to be noted that Airline in its application for a state charter named only one officer.

The people who shop at Northline City come from a wide area. A survey indicates that of these shoppers one-fourth would probably use a new bank located where Northline intends to locate.

This survey was made by Dr. Richard B. Johnson, Chairman of the Department of Economics at Southern Methodist University and director of the Southwestern Graduate School of Banking, and a witness for Airline. Dr. Johnson testified that a suburban bank's market territory is from one to two miles from the bank. He stated that a suburban bank, as distinguished from a downtown bank, is dependent upon its neighborhood and that its lending operations were largely in the installment credit field, and that its revenues depended, to a considerable degree, upon its service charges, and rendering service functions to individual depositors.

Dr. Johnson testified that in the area nearest the Northline Bank location about 41% of the residents indicated that they would probably use the new bank, with about 36% undecided.

Airline is the nearest bank to the Northline location. It is on Airline Drive, about one mile north of the Northline site. It has been in business, as a State and National Bank, since 1958. This date was before the North Freeway was completed and before construction of Northline Shopping City was commenced. After five months operation, Airline's deposits exceeded two million dollars. Its deposits have continued to grow as reflected by the following table:

| "Year | Deposits |
|---|---|
| 1960 | $ 4,619,499 |
| 1961 | 6,165,962 |
| 1962 | 7,420,332 |
| 1963 | 8,895,641 |
| 1964 | 10,870,568 |
| 1965 (April 26) | 11,500,000" |

Airline's deposits have increased 135% over the four year span 1960–1964.

In 1959, Airline made a profit of $41,000.00. It has made a profit each year of its operation; the profit in 1964 being $96,000.00, after taxes.

Airline has about 15,000 customers. Its president, Mr. W. S. Pebworth, Jr., is well satisfied with the bank's achievements.

The Republic National Bank which opened in 1963 and appears to be the nearest new bank to Airline, has not prevented Airline's growth.

In 1943, Heights State Bank was the only bank located north of Buffalo Bayou in the City of Houston. Now there are many banks located in North Houston. All of these banks in North Houston have a history of steady and continuous growth.

The growth of deposits of the 10 North Houston banks closest to the proposed Northline State Bank since 1960 is shown by the following:

| Bank | December 31, 1960 | October 1, 1964 |
|---|---|---|
| Airline National | $ 4,619,470.00 | $ 10,094,088.00 |
| Commercial State | 9,010,668.00 | 12,119,943.00 |
| Fairbanks State | 1,449,493.00 | 3,440,875.00 |
| Heights State | 19,126,208.00 | 25,242,425.00 |
| Northeast National | 3,099,817.00 | 5,910,013.00 |
| North Side State | 15,460,387.00 | 27,493,947.00 |
| Oak Forest State | 7,653,830.00 | 11,693,412.00 |
| Pinemont State | 1,669,805.00 | 4,535,637.00 |
| Port City State | 10,265,475.00 | 14,065,237.00 |
| Reagan State | 19,507,514.00 | 29,470,648.00 |
| TOTAL | $91,862,667.00 | $144,066,225.00 |

As is evident from these figures, Airline's percentage of deposit growth during this period has far exceeded the total percentage deposit growth of all North Houston banks, Airline's percentage being 118.5 and the percentage of the nine other North Houston banks being 53.6. The percentage deposit growth of all banks in Houston during this four year period was only 29.4.

There are many statistics in the record to demonstrate the healthy condition of banking in Houston, and its steady growth. Bank deposits in Harris County have increased from $2,510,860,000 in 1960 to $3,350,651,000 in 1964. Houston Clearing House figures for bank debits to individual accounts show that such debits have shown a steady annual increase during the same period, being $28,065,050,378 in 1960 and increasing to $39,342,970,798 in 1964.

Also it is shown that the clearings of all members of the Houston Clearing House increased from $23,323,677,231 in 1961 to $30,172,037,853 in 1964.

There is no evidence that the opening of Northline would jeopardize the solvency of any existing bank in Harris County, although there is evidence that Airline was concerned that its profits would suffer.

Airline devotes 31 pages of its brief to a summary of the evidence with respect to showing a lack of necessity for Northline. This is a remarkable condensation of this huge record. We will make such further condensation as is consistent with completeness.

Northline in its application stated that it proposed to serve a primary trade area approximately 12 square miles in the north central portion of metropolitan Houston.

This trade area has a median annual income of $5,709.00 [4] as compared to $5,900.00 for the entire City of Houston.

In 1960, this area had two banks. With the chartering of Northline it will have four banks. The number of households in the area per bank in 1960 was 7,104. With four banks the number of households per bank will be 4,236.

The electrical connections and building permits in this area for the period 1960–1964 show that the growth in households was between 2,369 and 2,734. The increase in households per bank during this period was 1,368.

In 1964, the estimated income per bank in this trade area was $24,180,470 which is less than the estimated income per bank in other areas in Harris County.

Northline's witness Mr. H. F. Finley, a Houston Realtor, testified as to the value of housing in several subdivisions located in this area. His estimates of the value of housing within the area were from $6,000 to $10,500 with most of the estimates running from $7,000 to $9,500. Airline's witness Mr. P. A. Smith, Sr., a building developer, characterized many of the neighborhoods as "older neighborhoods" with the housing valued from $5,000 to $9,000. In many of the areas out toward the city limits (along Little York Road) a purchaser cannot get FHA or GI loans because there is no city sewerage. Mr. Lawrence O'Donnell, another builder, testified that the north part of Houston was a "poor man's" area. He noted that low priced new homes for $11,350 were priced for that amount because they were for the working man with low income. He estimated the average monthly income at $400 per month. Mr. William Woodward, president of Reagan State Bank for the past nine years, testified that in 1962 his bank conducted a survey which reflected that the primary trade area of Reagan State Bank, a good portion of which falls within an enlarged area surrounding Northline, had a median income of $3,941. He described the residences in the Reagan area as "old and deteriorating to some extent." He estimated the value of the homes within a two-

---

4. This figure is shown elsewhere in the record as $5,129.00.

mile arc of Airline Bank as between $5,000 and $7,000 with a few going as high as $12,000 or $14,000.

Mr. Jerry Finger, president of Republic National Bank, the newest bank chartered in this enlarged area, characterized much of the area included as composed of persons in the middle to lower-middle and in some low-income groups. He indicated there was not a great deal of money in the area and that the demand accounts of the area typically had relatively low balances. Mr. Pebworth, president of Airline, corroborated this testimony indicating that average individual accounts in his bank would have a balance of $300. He testified that the commercial activity in the area consisted of retail stores and shops which were quite small.

Mr. O. S. Sinderson, a restaurant owner in the vicinity of Little York Road and Airline Drive, testified that he was well acquainted with the businesses between his restaurant and Airline Bank located some two miles South on Airline Drive. He described the businesses as small filling stations, drive-in groceries, hardware stores, etc., operated primarily by husband and wife or father and son.

Airline's witness Dr. Johnson divided the suburban area of Houston into three major sectors and statistics were developed with regard to each sector. In Sector I, north Houston and the trade area designated by Northline, had, as previously stated, a median family annual income of $5,129 in 1960. In Sector II, east Houston, this income was $6,932; in Sector III, west Houston, this income was $9,149.

From 1961–1964, the record shows that in Sector I there were 5,341 new residences; for Sector II 14,495; for Sector III 26,294. During this period five new banks were chartered for Sector I, three for Sector II, and six new banks for Sector III.

Airline has another exhibit which divides suburban Houston into six areas. The substance of this exhibit is stated by Airline to be, "If one takes the northern half of Houston, as illustrated by areas 1, 2 and 6 * * * one sees that the three areas together account for only 38 per cent of the total deposit growth enjoyed by all suburban banks in Houston for the period 1959 to 1964, whereas the southern three areas account for 62 per cent of such growth."

Dr. Richard B. Johnson, previously mentioned, is an eminently qualified economist. He testified at some length for Airline. Some of the data and exhibits used and prepared by Dr. Johnson have been referred to above. We quote the following from Airline's summary of the testimony of Dr. Johnson:

"In this case Dr. Johnson did three important things. He analyzed the nature of the market of Airline National Bank, analyzed and compared various aspects of the suburban bank market as they exist in Houston, and rendered his expert opinion concerning the probable extent of the market of a bank located in the Northline Shopping Center, the lack of necessity for such bank and the probable effect and consequences of chartering such a bank.

Airline's Exhibit 5 is a map of Houston with the postal zones indicated on it. Also affixed to the exhibit are tabs indicating the approximate location of the various suburban banks in Houston. Circles are drawn in one and two mile radii around the banks most closely located to the proposed location of Northline Bank. These circles demonstrate well the closeness in location of the existing banks and the interlocking nature of the trade territory and market areas of the existing banks. In determining the nature of the Airline Market, Dr. Johnson did an analysis by postal zones of the 8,292 individual demand deposit accounts in the Airline National Bank.

Of a total of 8,292 individual demand deposits in Airline National Bank,

3,617 were in Zone 22, 43.6 per cent of all individual demand deposits by number and 43 per cent of the amount in dollars. Zone 9 has 18 per cent of the number of accounts and 22 per cent of the dollar amount of individual demand deposits; Zones 22 and 9 together have 61 per cent of the total number of accounts and 65 per cent of the dollar volume which Airline National has. Zone 22 generates 29 per cent of the number of commercial accounts which account for 19 per cent of the dollar volume of such accounts. Zone 9 generates 18 per cent of the number and 22 per cent of the dollar amount of commercial accounts. Fifty-six per cent of the number and 41 per cent of the dollar volume of all commercial accounts was derived from Zones 22 and 9. Sixty-five per cent by number and 52 per cent by amount came from Zones 22, 9 and 16. Other zones are relatively unimportant.

Postal Zones 37, 38 and 39 all lie north beyond a two-mile radius of Airline National Bank. Airline derives something less than fifteen per cent of the total number of individual demand deposits and considerably less than fifteen per cent of the dollar amounts of commercial deposits and individual demand deposits from those three postal zones.

In summary Dr. Johnson testified that between 50 and 60 per cent of the deposit volume of the Airline National Bank is derived from Postal Zones 22 and 9, and that Zone 22 is the principal component of the primary market and lies within the two-mile radius of the Airline National Bank. The outlying sectors, north, south, west, produce less than ten per cent each of the deposit volume of the bank.

Dr. Johnson testified that in his opinion if a bank were located at the proposed location of the Northline State Bank the primary market of the Northline State Bank would be parts of Postal Zones 22, 9, 8, 18, 16 and 26, but principally 22 and 9. The attention of the court is called to the fact that with the exception of Zone 8, these are the identical postal zones which contain 80 per cent of the charge account business of Joske's. In his opinion the Airline National Bank over a period of years would share approximately equally its primary market, Zones 22 and 9, with the proposed Northline State Bank. He noted that they are both on the same side of Interstate 45 and Northline State Bank is more nearly in the exact middle of the combined zones, 22 and 9, than is Airline National. In his opinion, a bank located at the proposed location of Northline State Bank could not derive a significant portion of its deposits from beyond a two-mile radius from the bank. Dr. Johnson did not see any indications that there would be a significant growth in households or income within the radius of two miles of the proposed location of Northline Bank during the next five or even ten years. In this connection he indicated that the increase in households in this general territory had been very modest during the past five years although during the same period there had been very marked growth in households in most of the other suburban areas.

With regard to public necessity, Dr. Johnson said:

'Well, in my opinion, Sir, there is no need and no necessity for the bank. (Northline) You will observe that the territory is well covered at present by commercial banks readily accessible to all parts of the market. The Airline National is specifically well situated to serve much of the very territory that the Northline State must serve and readily accessible and with a good sized building and adequate parking

to do so. The Republic National Bank, a new bank, new building, new service functions, developed specifically to serve the territory to the northwest which must constitute part of the Northline State Bank, and similarly banks in all the other sectors readily available to the residents and employees of the area. Now undoubtedly Northline State Bank would serve the convenience of the retail stores and other establishments in Northline Shopping Center, and other residents and commercial operations in the general territory, but it does not, in my judgment meet the standards of need and necessity.' "

Mr. E. H. Henderson, a qualified banking expert, testified, in substance, that he had moved a bank, of which he was President, from a shopping center because some of the bank's customers had complained there was not ready access to the bank; that he had been approached to help in forming a new bank in the Northline Shopping Center but he refused because he did not feel that there was a necessity for such bank or that it would generate a sufficient volume of business at that location to be profitable. He also testified that he knew that eighteen months prior to the trial of this case an effort to obtain a national bank at this location had failed. Mr. Henderson was of the opinion that a bank at this location would have to be subsidized by deposits and loans from other correspondent sources or banks, this for the reason that his bank, located 2.2 miles northwest of the proposed Northline Bank, had been able to place only about one half of its loans within a two mile radius of his bank.

Mr. William Woodward, President of the Reagan State Bank, testified that in his opinion there is no justification or necessity for a bank at Northline Center, saying that in his judgment there were presently too many banks in Houston and that Northline would be located in an area very near other new banks which are having diffi-

culty making a go of it. He did not believe that chartering Northline would hurt his bank but in answering the question, "Is it going to hurt Houston?" he replied, "Yes, sir, one bank failure could tear us all up." Mr. Woodward also expressed doubt that Northline could operate profitably and his opinion was that it could not generate enough loans in its vicinity to justify its existence.

Mr. Jerry Finger, President and chief executive officer of the Republic National Bank, located about two miles from the proposed Northline Bank, testified extensively to the efforts made by his bank to obtain deposits and make loans saying that it spent about $1800.00 per month in promoting and advertising these endeavors.

Mr. Finger testified that only 35 per cent of his bank's demand deposits came from the primary trade area of the bank and that further enhancement of this percentum was unlikely because (1) there is not a great deal of money in the area. (2) there were many chain stores in the area and they merely use the local bank to transfer money to downtown banks (3) the residents of the area in the middle to low income class and (4) there simply was not a great volume of demand deposits to be derived from this area.

Mr. Finger stated that when the Northline charter was issued, his bank was not showing a profit "on an accrual method of accounting, which I think is the true method of bank accounting." The bank did, however, show a profit for the month of November 1964. The operation of the Northline Bank would, said Mr. Finger, " * * * result in an immediate dissipation of our present bank deposits."

Mr. Lee R. Allredge, a vice president of Joske's Department Store, testified that if Northline Bank opened Joske's would transfer its account with Republic National Bank, $123,000.00 in the fall of 1964, to the Northline Bank.

Mr. W. S. Pebworth, President of Airline, testified to efforts to obtain a loca-

tion for his bank when it was organized on the property later developed by the Northline Center. These efforts were not successful; also, the organizers of Airline were apprehensive that the Northline Center would not be built.

In Mr. Pebworth's opinion there was no public necessity as of November 25, 1964, for the chartering of a bank at the proposed location of the Northline State Bank because in his experience as a banker in the area for the past seven years there is not a sufficient volume of business in the general trade area of the bank such as would reasonably indicate a profitable operation for an additional bank located in the area. In his experience with Airline there are not sufficient lending opportunities in the area to put to full use the deposits which are generated in the area.

Mr. Harold A. Clark, a developer of shopping centers in Houston and a director of the Homestead State Bank, testified the Northtown Plaza Shopping Center which he developed did not need a bank because it was only five minutes away from Airline and the Republic National Bank; also that the Longpoint Shopping Center, the Ridgecrest Shopping Center and the Spring Village Shopping Centers did not have banks.

Mr. Clark also testified that the Homestead Bank had not shown a profit as of November 1964, it having then been opened for 17 months.

Mr. John M. Burns, manager of Montgomery Ward Store in Northline Shopping City and a director of Airline, testified that neither he nor Montgomery Ward had an account with Airline, and that if the Northline Bank was opened, Montgomery Ward would not use it; also, that Ward's has a store in Palm Center Shopping Center which has no bank. Mr. Burns did not believe that a bank placed in Northline Shopping Center would increase the business of the Ward Store. He was of the opinion that Airline was as convenient for Ward's customers as the Northline Bank would be

even though the distance might be greater [the difference between 4 or 5 blocks (Airline) and 1500–2000 feet (Northline)] he thought people would drive to the bank rather than walk.

Mr. Lawrence O'Donnell, a builder and developer in North Houston and a director of Airline, testified that builders were not building close to the Northline Shopping Center but were going further away from the center with their building development.

Mr. O. B. Faber, a customer of Airline, testified that it takes him about 15 minutes to go from his grocery store at 4220 Airline Drive to the bank and make a deposit using the drive-in window, and five minutes more if he goes in the bank.

Mr. O. S. Sinderson, a customer of Airline, testified that it takes him 15 or 20 minutes to go from his restaurant in the 8000 block of Airline Drive to the bank and make a deposit and return; also, that he was well acquainted with the merchants along Airline Drive and that a majority of them use the Airline National Bank, and that he has heard none of them express dissatisfaction with the bank.

Reverend Frank Park, pastor of the Rittenhouse Baptist Church, testified that he did not find it inconvenient to go from his church, located two and one half miles from Northline Shopping Center to the Airline Bank, and that he has not heard of any dissatisfaction among his church members with banking facilities in the area.

It is our opinion that this record presents a factual situation in which the discretion vested by the Legislature in the Banking Board is to be exercised in accordance with its sound judgment after appraising all the evidence in the light of the Board's special qualifications in this field. It is our opinion that under this record the Board could not have entered an order that would have been an abuse of its discretion. There is an abundance of evidence of a substantial nature which would have reasonably supported an order denying a charter to Northline as well as rea-

sonably supporting the order entered. It is in such situations that the expertise of the Board is employed with conclusive effect.

In Chimney Rock National Bank of Houston v. State Banking Board, 376 S.W. 2d 595, n. w. h., this Court, Associate Justice Phillips writing, made the first judicial construction by our Courts of the phrase "public necessity" found in Art. 342–305, using this language:

"In Moran v. Nelson, 322 Mich. 230, 33 N.W.2d 772, the Supreme Court of Michigan reversed the Banking Commission of that State and ordered the charter granted under a banking statute that required the Commission to be satisfied as to the necessity for such bank and the likelihood of its successful operation.

The court in the Moran case said that any one, exact definition of necessity would be futile. That necessity does not mean an 'absolute need' or 'economic need.' New banks provide additional banking capital for the community which results in greater diversity of competitive banking facilities. That necessity does not mean that existing banks are not meeting the present banking necessities. Such a restriction would not be conducive to healthy banking conditions. In this connection, the court quoted from the Minnesota Supreme Court in State ex rel. Dybdal v. State Securities Commission, 145 Minn. 221, 176 N.W. 759:

'It (the governing statute) does not intend that one or more established banks may keep out another because the banking facilities sufficiently take care of the banking business. Its purpose is not to deter competition or foster monopoly, but to guard the public and public interest against imprudent banking.'

The court in the Moran case held that 'mere convenience' was not enough to satisfy the statutory requirement but when supplemented by proof of facts and circumstances which are persuasive of necessity, it is proper to take into consideration testimony as to the element of convenience.

The Michigan Court found the proposed new bank to be necessary even though it was to be located in close proximity to strong and long-established banks in downtown Detroit and even though such banks were rendering a complete banking service. The court pointed out the rapid growth of the population in Detroit and the substantial growth of all of the banks in the Detroit area during the past few years. The court also referred to this evidence to show probable successful operation of the proposed new bank stating that the facts and circumstances bearing upon necessity also bear, to some extent, upon successful operation.

We approve the holding in the Moran case and the reasoning quoted above. The requirements of the Michigan statute concerning necessity and probable successful operation are substantially the same as the requirements in Art. 342–305 V.C.S.

\*   \*   \*   \*   \*   \*

Evidence presented by appellants as to the harm a new bank would cause those nearby banks already in existence showed no greater harm than any newly competing business will naturally inflict upon its neighbors in a similar enterprise. This evidence did not show any possible harm of such a nature as to endanger existence of the nearby banks. On the contrary, the evidence shows that the banks now in existence are in a healthy financial condition and are expanding. This evidence adds up to the fact that there will be nothing more than greater competition in the area. That this could have a beneficial effect of bring-

ing new capital into the area for further expansion and for greater diversity in competitive banking facilities. These are positive factors to be considered in attempting to define necessity under the statute.

As stated in the Moran case, above, it is very difficult to differentiate between the proof required to show necessity for a bank and that required to show the volume of business in the community where such proposed bank is to be established is such as to indicate profitable operation of the proposed bank. Certainly much of the evidence applicable to the former is equally applicable to the latter.

\* \* \* \* \* \*

Under the facts of this case we hold that the mere sufficiency of existing banking facilities, in the sense of some facilities more or less appropriately located in area and furnishing the usual gamut of services, is not in and of itself sufficient basis to deny establishment of the proposed bank where the general economy of the area and its reasonable potential are such that there is room for further installation without causing excessive competition with real harm to any nearby banks now existing or unduly affecting banking structure at large."

■ We apply this construction of the words "public necessity" to this record and when we do we find that the action of the Board in granting Northline a charter to open a bank in Northline Shopping City is sustained by evidence showing a "public necessity" for such bank. That the broad interpretation given to the words "public necessity," by us is correct is, we believe, augmented by these considerations.

Our Constitution, Sec. 16, Art. 16, Vernon's Ann.St., provides, in part, that, "The Legislature shall by general laws, authorize the incorporation of corporate bodies with banking and discounting priv-

ileges, and shall provide for a system of State supervision, regulation and control of such bodies which will adequately protect and secure the depositors and creditors thereof."

Art. 342–301, V.T.C.S., provides, in part, that, "Subject to the provisions of this Code, five (5) or more persons, a majority of whom are residents of this state, may incorporate a state bank, \* \* \*."

Art. 342–305, copied, in part, supra, requires an application for a bank charter to be made to the State Banking Board and requires the Board to approve such charter unless negative answer is made to some of the requirements of such Article.

■ There is nothing in either the Constitution or Banking Code of this State imposing, expressly or by implication, a condition that new banks not be organized or located in communities receiving banking service for existing banks. Such a restriction would be monopolistic in nature and would conflict with the express provision of our Constitution condemning monopolies. Art. 1, Sec. 26, Tex.Const.

■ The dominant purpose of our banking laws is the protection and security of a bank's depositors and creditors as is manifest from the Constitutional provision above quoted. This purpose is served here by substantial evidence reasonably supporting the findings of the Board, and not upset by the Trial Judge, that the volume of business in the community where Northline is to be established is such as to indicate profitable operation of the bank, and that the applicants for the bank charter are acting in good faith. Also, there is substantial evidence to the effect that the opening of Northline will not result in the closing of any existing banks or in their failure to operate at a profit.

The evidence here demonstrates the steady and continuous growth of the deposits and capital of Airline, of the ten North Houston banks nearest to Northline and of banks in Houston, generally.

When we consider that Northline City Center where Northline Bank is to be located has 45 stores patronized by thousands of people daily (60,000 per week) and the new highways in North Houston and steady growth of North Houston all as reflected by this record, we find substantial evidence reasonably supporting the finding of the Board that there is a public necessity for the Northline Bank. Public necessity in this instance is found in the need for additional banking facilities and capacity available to the public on a more competitive basis. As stated by us in Chimney Rock, "These are positive factors to be considered in attempting to define necessity under the statute."

We are of the opinion that the Board was within the limits of its discretionary power in determining, from the evidence of the growth of Airline and all other banks in the community, that the public's requirements for banking facilities and capacity on a more competitive basis had increased and that there was a public necessity to increase such facilities and capacity, which public necessity would be served by granting a charter to Northline.

We are much impressed by an article in 71 Yale Law Review 502 (1962) entitled "Banking Competition" from which we quote the following:

> "Decisions by bank regulatory agencies whether a new bank should be chartered, a new branch established, or an existing bank acquired by a holding company * * * may have in common the question of whether more or fewer banking alternatives are desirable * * *. Competition can function only if bank-users—primarily borrowers and depositors—may choose among a number of banking institutions, and if this choice is based upon which institution makes the most attractive offer. * * * Since each bank must vie with other banks in satisfying borrowers through such advantages as low interest rates, and vantages as low interest rates, and depositors through such advantages as high interest rates on time deposits or low service charges on demand deposits, the banking system will efficiently allocate depositors' funds to borrowers' needs.
>
> If the number of alternatives is substantially reduced, however, bank-users' choices may not force efficient bank behavior. * * * Moreover, such a reduction in banking alternatives may reduce credit availability to marginal risk borrowers. Since risk appraisal is a highly subjective exercise, banks are likely to differ reasonably as to the credit worthiness of a borrower. Thus, a borrower who would qualify under some methods of risk appraisal, but not under others, has less opportunity to obtain credit the fewer the available alternatives. Because new businesses and expanding small businesses are generally marginal risk borrowers, decreased credit availability may affect the competitiveness and growth of the rest of the economy. Apart from unintentional differences in credit appraisal, decreased alternatives may increase the probability of credit discrimination. Two banks, for example, which finance all the shoe retailers in their area may refuse to grant credit even to a low-risk borrower planning to open another shoe store.
>
> \* \* \* \* \* \*
>
> Neither the nature of banks and the money market nor banking regulation to control solvency and money creation offer any strong reasons that the industry should not provide bank-users enough alternatives so that their choice will effectively induce efficient bank operation and resource allocation."

■ We believe that sound and efficient banking is promoted and that public interest is served by fair competition between banks, and that public necessity exists to bring this about.

We reverse the judgment of the trial court and render judgment that Airline take nothing by its suit.

Reversed and rendered.