James O. GERST, Savings and Loan Commissioner of Texas et al., Appellants,

v.

HOUSTON FIRST SAVINGS ASSOCIATION, Appellee.

No. 11554.

Court of Civil Appeals of Texas.

Austin.

Dec. 6, 1967.

Rehearing Denied Jan. 3, 1968.

Crawford C. Martin, Atty. Gen., George M. Cowden, 1st Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., Sam Kelley and C. Fielding Early, Asst. Attys. Gen., Austin, Baker, Heard, Elledge & Sullivan, Lowell B. Hays, Elliott & Elliott, Loran L. Elliott, Houston, for appellants.

John W. Stayton, Austin, for appellee.

PHILLIPS, Chief Justice.

This suit was filed[1] by appellee Houston First Savings Association in the District Court of Travis County against appellant James O. Gerst, who was then the Savings and Loan Commissioner, seeking to set aside an order issued by the Commissioner. The order denied appellee's application for permission to open a savings and loan branch office in the City of Houston.

Prior to issuing this order, a public hearing was held before the Commissioner on December 12, 1966 concerning the application. Spring Branch Savings and Loan Association and Southwestern Savings Association, both of Houston, appeared at the hearing, opposing the application and both of these associations intervened on the side of the Commissioner at the trial.

The case was tried to the court without a jury and judgment was entered in May, 1967 overturning the order of the Commissioner and remanding the order to the Commissioner for findings not inconsistent with the judgment. All appellants have properly perfected their appeal to this Court.

We affirm.

Appellants are before this Court on two points of error, briefed together, namely, the error of the trial court in failing to hold that the order of the Commissioner denying the subject application is sustained by substantial evidence; in failing to uphold the findings of the Commissioner that there is no public need for the proposed branch office; that the volume of business in the community is not such as to indicate a profitable operation; and that the establishment of the branch office would result in undue harm to existing associations which are each and all supported by substantial evidence.

We overrule these points.

In denying appellee's application for a branch office the Commissioner made the following findings: there was no public need for the proposed branch facility; the volume of business in the community in which the proposed branch office would conduct its business is not such as to indicate a profitable operation; the establishment of the proposed branch office in the area would result in undue harm to the

[1]. Suit was filed pursuant to Section 11.12 of the Savings and Loan Act, Vernon's Ann.Tex. Rev.Civ.Stat.Ann. art. 852a.

other associations. All other findings required by the Savings and Loan Act and the Rules and Regulations for Savings and Loan Associations were favorable to appellee and are not in issue here.

■ The phrase public need as used in the Texas Savings and Loan Act, Tex.Rev. Civ.Stat.Ann. art. 852a, was defined by the Supreme Court in Gerst v. Nixon, 411 S.W.2d 350 (Tex.1966), as follows:

"We think the words 'public need' as used in Section 2.08(3) have the same meaning as the words 'public necessity' as used in the Texas Banking Code of 1943, l. c. art. 342–305, Vernon's Ann. Tex.Stats., that is, a substantial or obvious community need for the proposed association in the light of attendant circumstances, as distinguished from a mere convenience on the one hand and an absolute or indispensable need on the other."

In support of this definition, the Supreme Court quoted from the opinion of this Court in Chimney Rock National Bank of Houston v. State Banking Board of Texas, 376 S.W. 2d 595 (Tex.Civ.App.1964, no writ).

■ In Gerst v. Nixon, supra, the Court also held that the Commissioner's order is to stand or fall upon the evidence adduced and matters noticed at the hearing held by the Commissioner; that the Commissioner may not base his decision upon evidence disclosed by an investigation made by his office unless the report of the investigation is made a part of the official record and the parties afforded an opportunity to be heard with respect thereto; that only that part of the record that constitutes *competent* evidence may be considered by the reviewing court.

■ In State Banking Board v. Airline National Bank, 398 S.W.2d 805 (1966 writ ref'd n.r.e.), this Court held that there is nothing in either the Constitution or Banking Code of this State imposing, expressly or by implication, a condition that new banks not be organized or located in communities receiving banking services from existing banks. That such a restriction would be monopolistic in nature and would conflict with the express provision of our constitution condemning monopolies. Vernon's Ann.St.Tex.Const. art. 1, Sec. 26. Likewise, the Supreme Court stated in Gerst v. Cain, 388 S.W.2d 168 (Tex.1965), and restated in Gerst v. Nixon, 411 S.W.2d 350, 359, 360.

"Competition is the lifeblood of a free enterprise economic system. It is only because savings and loan associations are affected with a public interest, Brazosport Savings & Loan Ass'n v. American Savings & Loan Ass'n, 161 Tex. 543, 342 S.W.2d 747, that they are protected from *undue* injury brought about by *excessive* competition." (Emphasis added.)

With these guidelines in mind we review the evidence.

The area in which the proposed branch office will be located is in Houston, and is bounded on the north and east by the Hempstead Highway, on the south by the Katy Freeway, and on the west by the western city limits of Houston.

Mr. W. E. Dyche, Jr., president of appellee and a director since 1942, testified that appellee has been in business in Houston since 1921.

On November 30, 1966, the last end of the month before the hearing held on December 13, 1966, total savings held by appellee amounted to approximately $131,500,000.00. On that date its aggregate loss reserves, surplus and permanent reserve fund stock was "slightly over eleven million dollars." The resultant ratio of reserves, surplus and capital to savings was 8.36%, well in excess of applicable minima. Dyche also testified as to the profitability of appellee's operations during the current and preceding three years (a profit of

$165,000.00 in 1963; $550,000.00 in 1964; $872,000.00 in 1965; and $1,200,000.00 in the first eleven months of 1966) and to the fact that it had no supervisory problems.

Mr. Dyche testified that appellee had made a survey of the Houston-Harris County area to determine where branch offices of savings and loan associations were needed and could be located most advantageously.

He stated that the optimum characteristics of a potential branch office location are a community that is still growing, an area that will yield substantial savings and an area that needs a loan service—particularly in the case of appellee, a need for the small installment loan service that is afforded by appellee. The proposed location has all these characteristics.

Dyche testified that appellee had established a small loan department eighteen months before the hearing that was operating at a profit. This department is concerned with loans of less than $5,000.00, principally to finance the making of improvements to existing homes and to finance the purchase of lots upon which the borrowers intend to build homes in the future. This aspect of savings and loan operations had become particularly attractive both to the association and its customers because of prevailing economic conditions. As of November 30, 1966, the balance of loans in this department was approximately $2,778,000.00. The witness pointed out that no other savings and loan association in the area of the proposed branch was in this market significantly.

If the branch is opened, the branch manager will be a man experienced in the installment loan business; and the branch will first concentrate upon the making of such loans. That the branch proposes to make such loans will be widely advertised.

Another point made by Mr. Dyche was the imbalance reflected by appellee's past business experience in the primary service area of the proposed branch. He testified that in that area appellee had invested two dollars in loans for each one dollar it had received in savings. By way of comparison, he stated that in the instance of appellee's only existing branch, the savings received and the funds lent were almost equal.

Mr. Dyche also testified as to his familiarity with the budget for the proposed branch and unequivocally stated that in his judgment the branch would operate profitably.

Of significance to the matters here at issue, appellee, although the second largest of Harris County's twenty-four savings and loan associations, has heretofore been allowed to operate but one branch office. By comparison, Southwestern, one of the protestants, had five branches in operation on the date of the hearing with a sixth scheduled for opening the first of January, 1967, while the other protestant had three branches. Mr. Dyche testified that this lack of branches left appellee at a competitive disadvantage, particularly with respect to commercial banks; and that if appellee and other savings and loan associations are to compete effectively with the banks for savings, the associations must have branches.

The branch office presently operated by appellee is located at Post Oak and Westheimer. It has been very successful and has realized about twenty million dollars in savings and has made loans in like amount. The experience gained in the operation of this branch can be utilized in the operation of the proposed branch office.

In the main, the economic data offered in support of the application were developed by Economic Consultants, Incorporated, an economic research firm specializing in the preparation of economic and feasibility analyses for financial institutions, and presented at the hearing by its vice president, Mr. John William Beck. This economic study was introduced at the hearing held by the Commissioner and fully vouched for by Mr. Beck at the hearing.

Two areas of Mr. Beck's testimony bear on the issue of public need for the branch office that appellee seeks to operate. These are the economy of Houston and Harris County in general; the other, the economy of the area proposed to be served by the branch office appellee seeks.

The state of the general economy in Houston and Harris County was treated but briefly. Beck pointed out that Houston's civilian labor force had increased in mid-October, 1966, to 713,550, while at the same time the jobless total had decreased to 14,400, resulting in an unemployment rate for Houston of 2% as compared to the national average of 3.9%. He next called attention to the fact that bank clearings and debits to individual accounts in banks were in the same period up 12.8% and 13.6%, respectively. Correspondingly, the reported payroll for Harris County in the first quarter, 1966, was up 13.2% over the first quarter of 1965. These increases were accompanied by an increase in retail sales in 1966 of 8% and by substantial increases in utility usage, rail shipments, port tonnage and the like.

Mr. Beck summarized the reflection of the various economic indicators which point to the fact that the business activity in Houston is in a very healthy state.

The state of the economy of that portion of Houston that has been delineated by appellee in its application for the proposed branch as its "primary service area" was treated by Mr. Beck. As stated above, the primary service area is bounded on the north and east by the Hempstead Highway; on the south by the Katy Freeway, and on the west by the western city limits of Houston. Beck stated that the Hempstead Highway and the Katy Freeway are traffic barriers that more or less insulate this area.

The primary service area of the proposed branch office had a population of 39,488 persons on April 1, 1960. This population as of January 1, 1966, had increased to 53,600 persons, an increase of 14,112 persons or 35.7%. This population growth in the area between 1960 and 1966 (35.7%) compares to the population growth in all of Harris County of 24.2% during this same period. The average age of males in the area is 24.8 years and that of females 25 years; and this compares to respective averages of 27 years and 27.3 years for Harris County as a whole.

The aforementioned statistical data tend to prove two points. First, the population of the primary service area of the proposed branch is expanding. Second, the population of the primary service area has been growing at a faster rate than has Harris County's population.

Statistical data presented by the witness as to current population of the primary service area (55,600 persons as of September, 1966) further indicate its population is still showing growth characteristics.

In direct testimony, Mr. Beck further emphasized the favorable growth characteristics of the primary service area that the population has grown faster than the counties in the past and is forecast to continue growing at a faster rate than the county as a whole in the future. The forecast is that the population of this area will total 64,000 persons in 1970, an increase of 62.1% over the 1960 population of 39,488. It is one of the fastest growing areas in Houston.

Other independent indicators of the population growth that is occurring within the service area of the proposed branch were commented upon by Mr. Beck as follows:

An indicator of the population growth that has taken place and is projected to take place in the primary service area is provided by an analysis of telephone main stations that are in service and are projected to be in service by Southwestern Bell. Additional information submitted indicated that there were 13,500 telephone main stations in the Homestead 2 and 5 Exchanges in 1960. This number increased to

20,000 by 1966. This was a growth of 6,531 residential main stations or 48%. The total growth that is anticipated by Southwestern Bell between 1960 and 1970 is 14,023 main stations or 104%, an actual doubling of the number of telephone main stations of Southwestern Bell in the two exchanges.

Enrollment in public schools in the primary service area between 1960 and 1966 increased from 11,168 to 15,987 students, a growth of 4,819 students or 43.2%. The Spring Branch School District recently revised its estimates of anticipated enrollment upward to a total of 39,000 students for the year 1969, an increase of 30.9% from 1966 to 1969. The District, to accommodate projected enrollment, recently went before the voters with a $9.75 million bond issue to be used to finance expansion of existing schools and to construct new facilities. The bond issue was voted. Of the total enrollment in the District 55.8% is within the primary service area.

Other indicators of the population growth that has occurred and that is anticipated to occur within the area are the expansion of the Long Point National Bank's physical plant from a one-story to a four-story building; the planned expansion of the Sam Houston Hospital; the planned expansion of Spring Branch General Hospital; the planned expansion of Cameron Iron Works, Inc.

The availability of room for additional population increase within the primary service area was favorably commented on by Mr. Beck in his testimony relative to a land use study just completed by the City of Houston. That study reflects that about fifty percent of the residential area in the primary service area had already been developed with the remaining fifty percent available for future development. From a population standpoint the primary service area is somewhat less than 50% developed, but from a land use standpoint it is approximately 50% developed.

Beck presented evidence indicating that the median family income of families residing within the primary service area was $8,062 in 1960. This compares with Harris County, $6,062, and the City of Houston of $5,902. That the median family income in the area is substantially higher than that in the County as a whole or for the City. The high income characteristics of residents in the area were further illustrated by the witness' comment that "thirty-five percent of the families that reside within the primary service area had incomes in excess of $10,000.00 a year, whereas in Harris County, this figure was twenty-two percent." The percentage figure for the area is 60% higher than that for the County.

In addition, he testified that the primary service area is a growing community. There is a great deal of construction activity taking place within its boundaries. Homes being constructed in the service area are in the neighborhood of $20,000 and up in price.

The number of building permits for dwelling units in the primary service area were 464 in 1960, 1,053 in 1961, 2,249 in 1962, 3,529 in 1963, 4,551 in 1964, 5,099 in 1965 and 5,790 in the first ten months of 1966. For the City of Houston as a whole the number of residential building permits issued has declined each year since 1962.

The number of single family dwelling units constructed in the primary service area between 1960 and 1966 are as follows: 1960 equals 415 units, in 1961 342 units were built, 1962 equals 307 units, in 1963 374 units were constructed, 1964 equals 375 units and in 1965 453 units were built. During the first ten months of 1966 296 units were permitted. These data indicate that "construction of single family units has gone along on a fairly even keel since 1960."

The witness noted that construction of multi-family units in the primary service area has fluctuated from year to year since

1960. Forty-nine units were erected in 1960, 247 units in 1961, 889 units in 1962, 906 units in 1963, 647 units in 1964 and 95 units in 1965. So far in 1966, January through October, there have been a total of 395 units as opposed to 36 last year, so that there has been resurgence as far as construction in the area in 1966 as opposed to 1965. Construction is running about 68.5 percent ahead of last year through October of this year. That apartment dwellers are good savers of money.

The foregoing data indicates that the primary service area has experienced a substantial volume of construction activity in the past. The year 1965 was below average. However, construction, particularly in the multi-family unit category, is on the increase. Occupancy of these multi-family units is extremely high and the outlook is quite good.

Further evidence of expanding building activity in the primary service area is the development of a 500-unit apartment house on 32.5 acres of land immediately in back of the Spring Village Shopping Center, the tract lying close to the proposed branch site. An additional 400–500 town house apartment will be built in the western part of the service area. Moreover, 80 units are planned at a location a half mile from appellee's proposed site; 50 units will be constructed on Blaylock and 200 to 300 units built in the eastern portion of the primary service area.

In 1960 84.1% of the dwelling units in the primary service area were owner-occupied as compared to 58.4% for the County as a whole.

The 1960 census reflected that only 3.2% of the 10,092 houses in the primary service area were vacant and available for sale. In June, 1966, 93.6% of the apartment units in this area were occupied.

Economics Consultants presented further data concerning utilities, schools, traffic and capital improvements, commercial and industrial activity in the area and data concerning the financial institutions in the area. With respect to the financial institutions in the area designated as the primary service area there is one bank and one savings and loan association and twelve company credit unions.

With respect to the commercial and industrial activity, it would unduly lengthen an opinion to list the numerous plants in the area and the great number of workers they employ, however it should be pointed out that this area under consideration is unique with its mixture of high grade residential areas interspersed with industrial areas.

Testimony as to lack of need of the new facility was presented by two witnesses, one witness for Spring Branch Savings and Loan which is the only savings and loan company having a facility in the area designated as primary service area by appellee, and by a witness representing Southwestern Savings and Loan. The testimony of these two witnesses was scant with few details other than to suggest that the present savings and loan facilities in the area were adequate, that Southwestern Savings had been granted a branch on the Katy Freeway and that such branch should be given the chance to prosper and grow.

In addition, appellants pointed out that appellee had been subjected to credit restrictions by the Federal Home Loan Bank and any net savings received by them had to be applied under regulations against, approximately, nine million dollars borrowed from the Federal Home Loan Bank and, consequently, not available for loans in the area. That according to appellee's own evidence, the Hempstead Highway and the Katy Freeway are not the barriers to the primary service area that they were alleged to be. That appellee's exhibits show that there are many streets providing traffic access and flow crossing these alleged barriers and there are developed areas outside of the so-called primary service area having

quicker driving times to the proposed site than other areas within the primary service area.

Appellants also contend that the picture of financial institutions cited by appellee as being in the primary trade area is not a true one inasmuch as there are five savings and loan facilities, five banks, some twelve company credit unions and small loan or finance companies located either in the primary trade area or in a surrounding area adjacent to it.

While there undoubtedly will be some overlapping of trade territories with respect to the financial institutions located in the area and those pointed out by appellants to be in adjacent territory, the public need reflected by the record in this case does not rest upon the probability of economic activity but rather upon evidence showing a present public need resulting from accomplished rapid economic growth, together with proof of factors pointing clearly to an acceleration of economic growth in the future.

While the financial institutions already existing in the primary trade area as delineated by appellee, including the company credit unions, as well as those financial institutions outside but near this area, are all factors to be considered with respect to the application, still the order of the Commissioner is not supported by evidence of a substantial nature to support the findings he has made with respect thereto.

■ We hold that the action of the Commissioner was arbitrary and not supported by substantial evidence when he found that there was no public need for the proposed branch office. Gerst v. Nixon, 411 S.W.2d 350 (Tex.1967).

In *Chimney Rock,* supra, this Court stated that it is very difficult to differentiate between the proof required to show necessity for a bank and that required to show the

volume of business in the community where such proposed bank is to be established is such as to indicate profitable operation of the proposed bank. Much of the evidence applicable to the one is equally applicable to the other. We also said:

"Under the facts of this case we hold that the mere sufficiency of existing banking facilities, in the sense of some facilities more or less appropriately located in the area and furnishing the usual gamut of services, is not in and of itself sufficient basis to deny establishment of the proposed bank where the general economy of the area and its reasonable potential are such that there is room for further installation without causing excessive competition with real harm to any nearby banks now existing or unduly affecting banking structure at large."

Consequently, we also hold that the findings of the Commissioner that the volume of business in the community is not such as to indicate a profitable operation and that the establishment of the branch office would result in undue harm to existing associations are not supported by substantial evidence.

■ Appellants' evidence, at best, was to the effect that there are "some facilities more or less appropriately located in the area and furnishing the usual gamut of services." Evidence of the mere existence of these facilities is the main portion of their protest evidence and this, under the framework of the cases cited above, is not substantial evidence, where reasonable minds could differ, in a dynamic growing community such as that outlined by appellee. Gerst v. Nixon, supra.

The judgment of the trial court is affirmed.

Affirmed.