**W. Sale LEWIS, Savings and Loan Commissioner of Texas et al., Appellants,**

v.

**CENTER SAVINGS ASSOCIATION,
Appellee.**

**No. 11660.**

Court of Civil Appeals of Texas.

Austin.

March 19, 1969.

Rehearing Denied April 9, 1969.

Crawford C. Martin, Atty. Gen., Nola White, first Asst. Atty. Gen., Hawthorne Phillips, Staff Legal Asst. Atty. Gen., Sam Kelley, Ray McGregor, Mark W. White, Asst. Attys. Gen., Baker, Heard & Elledge, Lowell B. Hays, Elliott & Elliott, L. L. Elliott, Adam & Adam, Robert J. Adam, Houston, for appellants.

Billy B. Goldberg, Robert W. Baker, Houston, James K. Presnal, Austin, for appellee.

PHILLIPS, Chief Justice.

This suit was brought in the trial court by Appellee, Center Savings Association, as an appeal[1] from an order of the Savings and Loan Commissioner of Texas which was entered in October of 1967, denying an application for a branch office of Center Savings Association which was to be located in Houston, Texas.

The trial court set aside the order of the Commissioner in August, 1968, finding it unsupported by substantial evidence. It is from this judgment that appellants have duly perfected their appeal to this Court.

We reverse the judgment of the trial court and render judgment that the order of the Commissioner be reinstated.

Appellants are before this Court with two points of error, briefed together, the

---

1. Suit was filed pursuant to Section 11.12 of the Savings and Loan Act, Vernon's Ann.Tex. Rev.Civ.Stat. art. 852a.

**124**

first point is the error of the court in holding that the order of the Savings and Loan Commissioner of Texas, dated October 13, 1967, denying the branch office application of Center Savings Association was not reasonably supported by substantial evidence; point number two is the error of the court in substituting its discretion and judgment for that of the Savings and Loan Commissioner of Texas.

We sustain these points.

This case involves an application for a savings and loan branch office rather than a request for a charter. However, according to Benson v. San Antonio Savings Association, 374 S.W.2d 423 (Tex.1963), the statutory findings required for granting a savings and loan charter are also required as to the granting of a branch office application.

The required findings for granting a savings and loan charter are set forth in the Texas Savings and Loan Act, Tex.Rev. Civ.Stat.Ann. art. 852a, Section 2.08. This article provides, in part, the following:

"The Commissioner shall not approve any charter application unless he shall have affirmatively found from the data furnished with the application, the evidence adduced at such hearing and his official records that:

\* \* \* \* \* \*

(3) there is a public need for the proposed association and the volume of business in the community in which the proposed association will conduct its business is such as to indicate profitable operation;

(4) the operation of the proposed association will not unduly harm any existing association."

The Commissioner in his order made negative findings against the branch office application of Center Savings Association as to Subsections (3) and (4) of Section 2.08(d) and (h) of Rule 2.4. Concerning these findings the Commissioner's order read:

"\* \* \* The Commissioner finds that the establishment of the proposed branch office would excessively increase the competition for the same savings funds and the same loan market that is now being adequately served by the existing savings and loan facilities, and without increasing any benefits to the public. The Commissioner further finds there is no public need for the proposed facility; that it would result in undue harm to existing associations, and would result in excessively zealous competition."

The Supreme Court of Texas, in the cases of Phillips v. Brazosport Savings and Loan Association, 366 S.W.2d 929 (Tex.1963), Gibraltar Savings & Loan Association v. Falkner, 371 S.W.2d 548 (Tex. 1963), Benson v. San Antonio Savings Association, 374 S.W.2d 423 (Tex.1963), Gerst v. Cain et al, 388 S.W.2d 168 (Tex.1965), Gerst v. Nixon et al, 411 S.W.2d 350 (Tex. 1966), has laid down the principles of review for the case at bar. Briefly, these principles are:

1. Review is to be made of the record of evidence compiled before the Savings and Loan Commissioner.

2. The granting or the denial of a savings and loan office is discretionary with the Commissioner but it is not discretionary with the Court and the Court may not substitute its discretion and judgment for that of the Commissioner.

3. The order of denial issued by the Commissioner is presumed valid.

4. The Court may set the order of denial aside only if it concludes that the evidence shows that reasonable minds could not have reached the conclusion that the Commissioner reached.

This case presents the classic situation under the substantial evidence rule as applied by the courts of this State where, had this court been sitting as the Commissioner, it might have granted the permit; however, in reviewing the evidence as it

is required to do under the law, it cannot hold that there was no substantial evidence in the record before it to sustain the Commissioner's order.

Appellee's evidence with respect to public need was presented, in the main, by Mr. Thomas Willier and two of their own vice presidents. Mr. Willier was qualified as a Traffic and Business Consultant. Mr. Willier testified concerning an exhibit he had prepared in which he referred to an area immediately surrounding the proposed location for Appellee's branch as the "immediate trade area," then a general area surrounding this as a "serving area."

Mr. Willier designated as an "immediate area" a one mile radius surrounding the proposed branch office. The serving area was delineated by terminating it at major thoroughfares. The serving area here was designated as a more or less rectangular area of about four miles east to west and about three and a quarter miles from north to south. The serving area as thus defined has no savings and loan office, or branch in it now. The area is basically residential. Willier testified that in his considered opinion the vacant areas within the serving area will continue to be developed primarily for residential purposes.

Willier then cited the rapid growth of the city of Houston and its overall growth compared to that of the serving area. From 1960 to 1967 Houston as a whole has had a population increase of approximately 27%. That in this same period the "immediate area," described above, has shown a 70% increase in population for the same seven year period. That the rate of increase for the same period of time within the serving area also increased by 70%. That the median annual family income was in the order of eight to ten thousand dollars and the median home valuation ranged from $13,500 to $19,400. Based on his study Mr. Willier projected a 1975 population figure of 11,700 people within the one mile radius and in the serving area a projected population of 62,000.

This indicated a rate of growth of 60 percent from 1967 to 1975 and a rate of growth of 70 percent from 1960 to 1967.

Willier then introduced into evidence detailed figures of traffic counts moving along the arteries in the vicinity of the proposed location. He also testified as to what he considered to be certain natural barriers isolating the area in question from competing savings and loan companies and banks. Willier testified that the area in controversy can be generally defined in the triangle extending from the Katy Freeway up to the Hempstead Highway with the Addicks Reservoir which is somewhat a physical barrier to the West.

The record disclosed that in the general area north of Buffalo Bayou, west of Post Oak Road and south of the Hempstead Highway there are five Savings and Loan outlets and three banks. This count does not include Fairbanks State Bank and Northwest Savings Association Home Office immediately to the north of the Hempstead Highway.

Houston First Savings, which is near Spring Branch Savings Association Home Office, is some 3.2 miles from Appellee's proposed location while American Savings located in the Memorial Shopping Center located to the south of the Katy Freeway is only one mile away from the proposed location. Southwest Savings which is generally within the Memorial Shopping Center is located 1.1 miles away while Home Savings on Memorial Drive is 2.4 miles from the proposed location.

Appellee's two vice presidents, Joe Westmoreland and Charles Arnold, made excellent witnesses and developed substantial testimony as to the business soundness of the proposed venture. Under the view that we take of this case, we need not go into their testimony further because of the fact that there is sound, substantial testimony to the contrary.

Appellants' principal opposition witness was John P. Owen, Dean of the College of Business Administration at the Uni-

versity of Arkansas. Prior to his present employment he was director of graduate studies in the College of Business Administration, University of Houston. He resided in Houston for eighteen years while being associated with the University there.

Dr. Owen testified to a study and analysis he had made of the extent of the saturation of the savings and loan market in what he has described as "the more realistic service area of the proposed branch office." In the service area as defined by Owen (which includes the banks and savings and loan facilities to the south of Katy Freeway) the total number of accounts approximated 79 percent of the number of families in the area. Nationally, the same figure is somewhere in the neighborhood of 71.1 percent. That the average balance of savings accounts in the area was $2,187 while nationally it was $2,696. Owen concluded that the area is saturated with the services of existing savings and loan associations; that there is no clear public need for additional services; that if a new branch operation were established that it would experience difficulty in developing a profitable business.

The Commissioner also found in his denial order that the delineated trade area for the proposed branch office was not realistic. Dr. Owen concurred in this finding stating that assuming an average driving speed of twenty miles an hour in ten minutes one can go approximately three and one half miles. That this driving time would be ample to reach a number of the savings facilities already in operation including those south of Katy Freeway. It should be pointed out here that there are approximately eight underpasses under the Katy Freeway allowing access to either side. He was also of the opinion that the proposed branch would face intense competition from those facilities south of Katy Freeway because of the high quality of the

community centers in which they are located.

It should be pointed out here that Appellee strongly urges upon this Court the similarity of the facts and the law of the case at bar with our decision in Gerst v. Houston First Savings Association, 422 S.W.2d 514 (Tex.Civ.App.1967, no writ). Gerst v. Houston First is inapposite here. There a strong case was made by the proponents, as was done here, while the opponents of the charter presented little more than testimony to the effect that there were other savings facilities in the immediate neighborhood which could adequately serve the public. In view of the overwhelming evidence presented to us as to "public need resulting from accomplished rapid economic growth, together with proof of factors pointing clearly to an acceleration of economic growth in the future" op. cit., this Court had no choice other than to uphold the judgment of the trial court to the effect that the order of the Commissioner was not supported by substantial evidence. For us to follow Gerst v. Houston First here we would have to completely ignore the "saturation" evidence presented by Dr. Owen or relegate it to no more than a mere scintilla.

With respect to the statement in Appellee's brief that this Court "adopted and relied on the testimony of the expert witness, Beck, to the effect that "the Hempstead Highway and the Katy Freeway are traffic barriers that more or less insulate this area," the fact of the matter is that this was no more than a statement, among many, made by the witness, was certainly not controlling there and is not controlling here.

The order of the Commissioner reads as follows concerning the profitability[2] of the proposed branch:

"It was also shown that the population and population characteristics of the

2. Rule 2.4(h) of the Rules and Regulations for Savings and Loan Associations provides:

"(h) there is a public need for the proposed branch office and the volume of

business in the community in which the proposed branch office will conduct its business is such as to indicate a profitable operation to the association within a reasonable period of time."

area are not adequate to support profitably the proposed facility and there is not an adequate volume of business to be generated in this area to support the proposed facility."

Dr. Owen provided ample evidence at the hearing before the Commissioner on this point. He stated that from his study of the matter that while the savings deposits of the sixteen savings facilities in the area rose between 1961 and 1966, they rose at a sharply declining rate. Here he cited his percentages of decline. He stated that this data discloses that there is less growth in deposit potential for both existing associations, and particularly for new associations, so that the capacity of new associations to develop a sufficient volume of business to justify their profitable operation is declining. In addition Dr. Owen pointed out that in 1950 there was an average population in Harris County per savings office of 110,000; in 1960 of 70,000 and in 1965 of 28,000. By describing the trade area according to his conception, he found the population to be 80,000 which is served by several savings facilities. By dividing these facilities into the population we find one facility for each 11,500 people.

With respect to his analysis of the Southwestern Savings branch office as of June 30, 1967 (six months after it had opened its doors for business) deposits were listed at $262,297. Dr. Owen then testified that in his opinion a savings and loan branch office would not break even until it had achieved new deposits of approximately $1,200,000. Further, that in his opinion the proposed branch would not stand as good a chance as Southwestern to develop new deposits. His analysis in this regard was based on Southwestern's experience of generating only $262,000 in new deposits in six months; on a change in competitive conditions; on the fact Gibraltar's branch office has subsequently opened, thus intensifying competition in the service area.

The Commissioner in his order of October 13, 1967, found that Northwest Sav-

ings Association would be unduly harmed in the event Appellee, Center Savings Association, had a granting of its branch office application. In this view the Commissioner noted that Northwest opened for business in October, 1966, has a moderate savings flow and is not yet insured by the Federal Savings and Loan Insurance Corporation. A further finding of the Commissioner on undue harm read:

"* * * the Commissioner finds that where an excessive number of branch office facilities should be established in an area and operations prove to be unsatisfactory and unprofitable, the branch office of an association which has its home office in another area, can be closed without serious damage or undue harm or impairment of its capital structure, but such is not the case where an association has its home office in an area and such office facility cannot be closed without being liquidated."

Northwest Savings is located in a relatively undeveloped area to the north of Appellee across the Hempstead Highway. The Commissioner's finding was buttressed by testimony from Northwest Savings executive vice president who opposed the granting of a branch office to Appellee. He reiterated the fact that the branch office was open for business without insurance coverage and that an additional branch office would hamper that association's efforts to maintain its deposit requirements.

The Commissioner properly discharged his duty in finding no public need for the proposed branch and the case of Benson v. San Antonio Savings Association, supra, is a case in point. The appropriate language of this case at page 427, reads as follows:

"It would be convenient to customers and probably produce more business if branch offices were established in every corner grocery and drug store in the City, but obviously that practice would not be economical nor would it promote public advantage. On the contrary it

would serve to create 'excessively zealous' competition to the detriment of the public and to the savings and loan industry at large. It must be admitted on the other hand, that the establishment of some branch offices will be in the public interest. So the matter of drawing the line of demarcation, while nebulous, must lie, to a great extent, in the discretion of the Commissioner. * *"

We reverse the judgment of the trial court and render judgment reinstating the order of the Savings and Loan Commissioner.

Reversed and rendered.