**CHIMNEY ROCK NATIONAL BANK OF HOUSTON et al., Appellants,**

v.

**STATE BANKING BOARD of Texas et al., Appellees.**

No. 11192.

Court of Civil Appeals of Texas.

Austin.

March 4, 1964.

Rehearing Denied March 25, 1964.

Baker, Heard, Elledge & Watkins, Lowell B. Hays, Houston, for appellant.

Waggoner Carr, Atty. Gen., Joe R. Long, Asst. Atty. Gen., Austin, Butler, Binion, Rice & Cook, Frank J. Knapp, Houston, Hart & Hart, Austin, for appellee.

PHILLIPS, Justice.

This case involves the validity of a charter issued to the Post Oak Bank of Houston, Texas by the State Banking Board of Texas.

The hearing before the State Banking Board on the application for the charter was held in November, 1962. At the conclusion of the hearing the Board by a majority vote approved the application. Chimney Rock National Bank also of Houston, and others [1] brought suit in the District Court of Travis County against the State Banking Board and its members protesting the granting of the abovementioned charter

1. The remaining appellants all located in Houston are: University State Bank, River Oaks Bank and Trust Company, American Bank and Trust Company, First State Bank of Bellaire, Fannin Bank and Long Point National Bank.

and seeking to set it aside. The plaintiffs alleged that they had protested the granting of the charter and that they were entitled to a de novo trial in the Court of the issues determined by the State Banking Board based on the preponderance of the evidence. In the alternative they asserted that certain of the Board's determinations were not supported by substantial evidence. The defendant State Banking Board and its members filed pleas in abatement and an original answer. Later, the applicants for the charter of the Post Oak Bank[2] filed a petition in intervention, asserting their interest in upholding the order of the State Banking Board granting their application.

The case went to trial in April, 1963 before the Court without a jury. The Court announced at the beginning of the trial that he would carry along the question as to whether the case should be tried under the substantial evidence rule or the preponderance of the evidence rule. The case took more than two weeks to try, the statement of facts consisting of three volumes containing 1497 pages of testimony.

The Court held that the action of the State Banking Board approving the application for the charter for the Post Oak Bank was supported by substantial evidence and also by the preponderance of the evidence and the Court rendered judgment upholding the Board's order.

We affirm the judgment of the Trial Court in that there was substantial evidence to support the order. Chemical Bank & Trust Company v. Faulkner, Tex., 369 S.W. 2d 427.

The Chimney Rock National Bank and the others who attacked the Board's order, the appellants in this Court, maintain that the sole question before this Court is one of law as to whether or not the findings and conclusions of the State Banking Board of Texas (1) that a public necessity exists for the proposed Post Oak Bank and (2) that the volume of business in the community where the Post Oak Bank is to be established is such as to indicate profitable operation of the proposed bank, are reasonably supported by substantial evidence. These are two of the requirements among others that are not contested here that must be met under Article 342—305, Vernon's Ann. Civ.St. in order for the Banking Board to issue a charter.

■ The Supreme Court has held recently in the Chemical Bank & Trust case, supra that the validity of charters issued by the Banking Board are to be tested under the substantial evidence rule. It is not the prerogative of the courts to substitute their judgment for that of the Banking Board where evidence admitted before the Court preponderates against the administrative decision. Nor is it the duty of the courts to affirm such action where there is merely some evidence to support the decision. The test is whether the action of the Banking Board from consideration of the entire record in the case as that record was made in the Trial Court finds reasonable support in substantial evidence. Board of Firemen's Relief and Retirement Fund Trustees of Houston v. Marks, 150 Tex. 433, 242 S.W. 2d 181, 27 A.L.R.2d 965.

■ The evidence that appellants offered before the Trial Court may be summarized as follows:

Chester H. Baker, Senior Banking Examiner for the State Banking Department of Texas, made an investigation in the area of the proposed bank, found no need for the bank in that it was his opinion the area was being adequately served by the banks already in the area. That the Post Oak center area was being adequately served by the Chimney Rock National Bank and the Highland Village State Bank, that the proposed bank would be detrimental to these banks

---

2. Intervenors are William H. Levy, E. Joseph Wolf, Ralph Rupley, L. E. Tuffley, Jack Harris, William T. Keenan, Robert H. Singleton, J. S. Oshman, Robert L. West, Cecil N. Cook, Louis Leon, George A. Butler and Tom A. Anderson.

from the standpoint of taking away deposits from those two existing banks. It should be noted at this point that the two last mentioned banks are generally considered to be the two banks in the general trade area of the proposed Post Oak Bank; however, the Highland Village State Bank is not a party to this suit. As to residential accounts, it was Mr. Baker's opinion that the proposed bank would be no better situated, from the standpoint of serving the people of the area, than the existing banks.

Mr. Thomas E. Willier whom appellants describe as a nationally recognized traffic and business consultant stated that the existing banks were more accessible to customers in the designated trade area than the proposed bank. In this connection driving accessibility was compared with certain census tract maps that appellee offered in evidence to show that areas included within a five minute driving time from the proposed bank location are from areas now fully developed or have reached their ultimate in population. That much of the area included within the ten minute driving zone of the proposed bank is area which has reached its ultimate residential population. Recent aerial photographs showing the area in question along with like photographs of downtown Houston were introduced to show the difference of population and building densities between the two areas. Also recent aerial photographs were introduced to show the vacant land in the area in question. Mr. Willier also testified that the several savings and loan associations in the area were in competition with the nearby banks.

Mr. Richard B. Johnson, whom appellants qualified as a banking and business expert, testified that for a bank to succeed in an area there must be at least five thousand families, preferably seven thousand five hundred; at least two hundred businesses, preferably three hundred and that this bank must be the only bank in the trade area. That the families involved should at least be middle income families. That guaranteed the above conditions, a

bank can expect to realize only 40% of the business potential. That according to figures furnished by appellants there were 6934 families or dwelling units within a 1½ mile radius of the proposed bank location. That in addition there are the two competing banks mentioned above within this same trade area. That the merchants in the area have their principal stores and bank accounts in downtown Houston and further contended that none of these merchants would move their accounts to the proposed new bank.

Mr. Johnson further testified that he had secured the services of Louis and Bowles, a recognized firm of research consultants, to conduct a residential and business survey to determine current banking affiliations of the residents and businessmen in the area to determine a need for and a probable use of the proposed bank. The results of this survey showed that the banks in the area rely on the area for business; that there was a lack of a "felt need" for a bank; there was lack of a "likelihood of use" of a new bank; that fewer than six hundred families in the area would use the proposed bank.

Mr. Johnson further testified that he supervised a "lobby card survey" which consisted of distributing cards in several banks in the area. These cards contained blank spaces for certain information which people who might be in the banks containing the cards could fill out or not as they saw fit. These cards inquired as to the adequacy or inadequacy of the existing banks in the trade area and as to whether or not the person filling out the lobby card would use the new bank. Only 5.8% of the people filling out the cards thought the existing service inadequate and would use a new bank.

Mr. Johnson testified from postal zone maps that had been introduced into evidence to the effect that the area that would allegedly be served by the new bank was now being adequately served by the banks already in the area. In this regard he testi-

fied that the banks already in the area depended greatly upon their customers' use of their deposit accounts and would be damaged through the loss of a substantial number of these accounts as they rely heavily on these service charges for bank income. That the banks in the area have either not reached the desired rate of return on their invested capital or are now only experiencing adequate earnings; that the banks in the area are relying too heavily on service charges for income and too little on other sources of banking income and that the loss of any accounts and deposits by further competition would harm the already existing banks. That the ratio of capital accounts to total assets of banks in the area is low by comparison with the same ratio of other banks in the same Federal Reserve District. That the proposed bank would work a "critical attrition" against both the Chimney Rock National Bank and the Highland Village State Bank.

Appellees' testimony offered in defense of the order is summarized as follows:

The testimony of Mr. George A. Butler, a Houston lawyer, long prominent in legal and banking business was offered. Mr. Butler has practiced law in Houston since 1925 where his practice has been primarily in connection with banking and finance. He was a member of the Board of the National Bank of Commerce, one of the largest banks in Houston, from 1933 to 1956. During the time he was on the Board of Directors, the National Bank of Commerce grew in deposits from 15 to 16 million dollars to 350 to 400 million dollars.

Mr. Butler was the organizer and has been a Director, President and Chairman of the Board of the Bank of Texas ever since its organization some six years prior to the trial of this case. The Bank of Texas is located in downtown Houston within a few blocks of the older, major banks in Houston. This bank was opened in January, 1957. Mr. Butler testified as to how he personally selected the personnel of the new bank and directed its policies. Within six years the Bank of Texas has grown so that its deposits now total about $47,700,000. Mr. Butler has also served on the Boards of Directors of other well known corporations.

Over a period of two months during the summer of 1962, Mr. Butler visited each morning all of the businesses in the area of the proposed new bank explaining his plan for the new bank to sales people, managers and owners. He testified to an "enthusiastic reception" and "they all felt like they needed a bank there." Speaking of people who had substantial investments in the community, Mr. Butler found that they thought "there was a real need, a real necessity and a real convenience for a bank."

It was then decided to go ahead and organize a bank with an initial capital of $1,000,000.00. There was a substantial over-subscription of the capital stock. Of the 130 stockholders, 80 of them either work, have a business, own property, or reside within the business area of the proposed bank. Out of the 50,000 shares constituting the capital stock of the bank, 36,000 shares are owned by people in the area. Over 30 of the prominent stores within the area are substantial stockholders. Mr. Butler named a few which he characterized as "household words" in Houston, viz., Weingarten, Oshman's Sporting Goods, Krupp and Tuffley, Station KPRC TV, Sakowitz, Everett-Beulow Ladies Ready to Wear, Smart Shop, Vogue's Shoe Store, Palais Royale, Rice Food Market, Esther Wolfe, among others.

Mr. Butler testified that the directors of the proposed bank show a net worth in excess of ten million dollars and in his opinion represent the finest in Houston's business activity, and their judgment about the proposed bank would be as good as anyone he knew.

Mr. Butler also testified in great detail as to the private residence and apartment house developments in the area. In addi-

tion, Butler testified that in his opinion there was a need for the bank in the area; that the opportunity for building the proposed bank is the greatest opportunity in Houston outside of downtown Houston; that in five years it would be the greatest suburban bank in Houston; that he had greater hopes for it as a growing bank than he does for the Bank of Texas whose growth he believes phenomenal; that the area in question is the greatest concentration of business outside of downtown Houston and will be many times larger in the next five to ten years.

Appellees next presented the testimony of Mr. Francis Scott Yeager who qualified as an expert in business and finance. This testimony was to the effect that the proposed bank is to be located in Houston, a city which over the past twenty years has had an unequalled history of dynamic growth and expansion; that the access to the specific trade area has been greatly improved by the construction of expressways, the widening of existing streets, the elimination of traffic bottlenecks and by the opening of new roads. Yeager testified in considerable detail as to the growth in the land area in the City of Houston, the growth in location and number of schools established on the southwest part of the City of Houston from 1950 to 1962, the growth in population in the different census tract within the trade area of the proposed bank in the southwest section of Houston from 1940 through 1963 and the estimated ultimate population of each of these census tracts, the area of undeveloped land within the vicinity of the proposed location which is available for future development and the building permits issued within the last three years in the different census tracts within the trade area of the proposed bank.

Yeager testified from numerous photographs introduced into evidence which disclose an area of extraordinary economic prosperity with the very highest quality of commercial and residential construction, showing the development of a community equal in size and in number and variety of facilities to many independent cities.

Yeager further testified that bank deposits for Harris County as a whole had doubled between 1951–1962 and for the same period the bank deposits for the southwest part of Houston had increased more than sixfold. That in 1959 the median income for all of Harris County was $5,900.00 while the median income for that same period for the different census tracts in the trade area were respectively, $13,329.00, $13,744.00, $20,093.00, $18,586.00, $21,102.00, $8,620.00 and $6,848.00.

Yeager pointed out that there is a unity between the way that the Freeway System was planned and the way long range investments are made for a large number of projects. That a wide variety of projects are related to the Freeway System as a whole so as to bring about a qualitative change in the City of Houston which is not reflected in mere population growth figures or any kind of numerical figures. That it is a change in the whole character of the town by reason of the town becoming so large in land area and population and so adjusting by creating the Freeway System. That this is a sudden change in Houston that it is a permanent change and that the City is still in the process of adjusting to it.

Yeager testified that in his opinion there was a need for a bank in the proposed area and that if allowed, it would be a profitable operation.

Mr. Jacob Oshman is one of the appellees and was a witness at the trial. Mr. Oshman has lived in Houston for thirty two years. He is in the sporting goods business and opened his first store in Houston in 1931. He now has a downtown store on Main Street in Houston and five other retail stores in the Metropolitan area of Houston as well as one in Austin. He has recently opened a store in the vicinity of the proposed new bank having moved this store from a previous location in Highland Village because the new location is superior to the former location in quality and potential

for future growth. That the move has been justified is that the volume of business has increased by more than fifty percent.

Mr. Oshman is one of the merchants in the proposed area for the new bank and has agreed to buy a thousand shares in the new bank. He stated that on his experience and knowledge of the area and of his knowledge of business generally, it was his opinion that a bank at the proposed location would be of great service to the merchants of the area and to the customers who patronize the businesses in the area. That such a bank will aid in the development of the shopping center as a fully integrated and complete suburban center. He stated that in his opinion the bank was "vitally needed" and that there would be sufficient business in the community for the profitable operation of the bank. He also stated that he would like to get more of the stock in the bank if he could.

Mr. Ralph Rupley, also one of the appellees, testified that he has lived in Houston since 1900. He has been engaged in the retail fur business in Houston for forty years. He has been President and Director of the Houston Retail Merchants Association, a Director of the River Oaks Bank in Houston, a Director of the Commercial State Bank of El Campo and a stockholder and director in corporations engaged in investing money and in developing real estate in the Houston area. He has been particularly acquainted with the southwest section of Houston and its recent development. He has purchased property in the vicinity of the proposed bank and has opened a store there. He has personally subscribed for 500 shares of the stock of the Post Oak Bank and three other members of his family have subscribed for 100 shares each. He is one of the Directors of the Post Oak Bank.

In the light of Rupley's experience as a business man and with his knowledge of real estate and development in Houston, it is his opinion that the Post Oak Area is an "ideal location" for any type of business or bank. Mr. Rupley discussed in detail the development of the area describing the Sakowitz Store, the Joske Store, and his confidence that there would be a sound and continued development of the area of a very high quality. Mr. Rupley further expressed the opinion that there is sufficient business in the community to make for the profitable operation of a bank at the proposed location and that "currently there is a good deal of retail activity in that area which needs banking."

Dr. John R. Stockton testified for appellees. Stockton is a Professor of Business Statistics at the University of Texas and Director of the Bureau of Business Research at the University. In addition he is a Director of the San Antonio Branch of the Federal Reserve Bank. Stockton testified extensively as to the merits of the various polls presented into evidence by the appellants herein and summarized above in this opinion. His conclusion was that the value of the polls was extremely doubtful and could not be properly used as the basis for making any decision as to whether a bank was needed.

It is interesting to note that through appellants' witness Johnson that the volume of deposits for the banks in the general area (as distinguished from the immediate trade area in question) was as follows: Spring Branch State Bank, $12,700,000.00; Highland Village State Bank, $12,237,000.00; Chimney Rock National Bank, $10,541,000.00; River Oaks Bank and Trust Co., about $19,000,000.00; First State Bank of Bellaire, $19,400,000.00; American Bank and Trust Co., $14,400,000.00; Fannin Bank, in excess of $40,000,000.00; University State Bank, slightly over $24,000,000.00. That 79% of the total banks by number in the United States today have a volume of deposits of less than $10,000,000.00.

There are no cases in Texas wherein the public necessity requirement or the

volume of business necessary to indicate a profitable operation requirement of Art. 342—305 have been defined.

In Moran v. Nelson, 322 Mich. 230, 33 N.W.2d 772, the Supreme Court of Michigan reversed the Banking Commission of that State and ordered the charter granted under a banking statute that required the Commission to be satisfied as to the necessity for such bank and the likelihood of its successful operation.

The court in the Moran case said that any one, exact definition of necessity would be futile. That necessity does not mean an "absolute need" or "economic need." New banks provide additional banking capital for the community which results in greater diversity of competitive banking facilities. That necessity does not mean that existing banks are not meeting the present banking necessities. Such a restriction would not be conducive to healthy banking conditions. In this connection, the court quoted from the Minnesota Supreme Court in State ex rel. Dybdal v. State Securities Commission, 145 Minn. 221, 176 N.W. 759:

> "It (the governing statute) does not intend that one or more established banks may keep out another because the banking facilities sufficiently take care of the banking business. Its purpose is not to deter competition or foster monopoly, but to guard the public and public interest against imprudent banking."

The court in the Moran case held that "mere convenience" was not enough to satisfy the statutory requirement but when supplemented by proof of facts and circumstances which are persuasive of necessity, it is proper to take into consideration testimony as to the element of convenience.

The Michigan Court found the proposed new bank to be necessary even though it was to be located in close proximity to strong and long-established banks in downtown Detroit and even though such

banks were rendering a complete banking service. The court pointed out the rapid growth of the population in Detroit and the substantial growth of all of the banks in the Detroit area during the past few years. The court also referred to this evidence to show probable successful operation of the proposed new bank stating that the facts and circumstances bearing upon necessity also bear, to some extent, upon successful operation.

We approve the holding in the Moran case and the reasoning quoted above. The requirements of the Michigan statute concerning necessity and probable successful operation are substantially the same as the requirements in Art. 342—305 V.C.S.

There was ample evidence from which the Trial Court could have upheld the order of the Banking Commission.

The City of Houston has had a phenomenal growth. From 596,000 inhabitants in 1950 it increased to an estimated 890,000 in 1957 to 938,000 in 1960, to 984,000 in 1962, and to 1,014,000 in 1963. In addition to the general growth of Houston, appellees presented detailed evidence of a continuing growth in population in the area for the proposed new bank comprising a general class of residents whose mean annual income is some three to four times the average annual mean income of Houston as a whole. This evidence was supplemented by extensive photographs of high-grade residential developments and apartment complexes already existing in the area.

In addition to the residential development of the area, appellees went into detail as to the business establishments in the immediate area in question, pointing out the numerous businesses already located and those building or to be built in the immediate future. These are not all new businesses but in many instances are branches of well-established, successful Houston businesses whose newly located branches in the area are as large or nearly

as large as their parent establishments in downtown Houston.

Appellees introduced evidence as to the extensive new freeways servicing the area along with other newly completed feeder arteries which they contend will facilitate further development of the southwest quadrant of the sprawling city resulting in a change of the whole character of the town. That these new traffic lanes are bringing about such a change because of the fact that the City of Houston has become so large in land area as well as in population.

■■ This type of evidence is pertinent in showing a necessity for the bank as contemplated by the statute. As to growth in an area to be served by a proposed new bank being valid evidence in upholding the granting of a new bank charter, see Suburban Bank of Kansas City v. Jackson County State Bank, 330 S.W.2d 183 (Mo.App.1959).

■ It should be pointed out that while appellants contend that appellees had no direct evidence as to the amount of new accounts that would be brought to the proposed new bank, of the 130 stockholders, 80 of them either work, have a business, own property or reside within the business area of the proposed bank. Out of the 50,000 shares constituting the capital stock of the bank, 36,000 shares are owned by the people in the area. It is reasonable to infer that a good percentage of these stockholders will place all or a portion of their business and personal accounts with the new bank. In view of this situation, coupled with the expanding nature of the area, detailed evidence of accounts definitely available is not necessary.

■ Certainly the enthusiasm with which the proposed stock offering was met and the promptness with which it was subscribed, coupled with the financial standing and proven business abilities of the directors and principal stockholders, is good evidence for the need and probable success of the proposed venture.

Evidence presented by appellants as to the harm a new bank would cause those nearby banks already in existence showed no greater harm than any newly competing business will naturally inflict upon its neighbors in a similar enterprise. This evidence did not show any possible harm of such a nature as to endanger existence of the nearby banks. On the contrary, the evidence shows that the banks now in existence are in a healthy financial condition and are expanding. This evidence adds up to the fact that there will be nothing more than greater competition in the area. That this could have a beneficial effect of bringing new capital into the area for further expansion and for greater diversity in competitive banking facilities. These are positive factors to be considered in attempting to define necessity under the statute.

As stated in the Moran case, above, it is very difficult to differentiate between the proof required to show necessity for a bank and that required to show the volume of business in the community where such proposed bank is to be established is such as to indicate profitable operation of the proposed bank. Certainly much of the evidence applicable to the former is equally applicable to the latter. However in connection with whether or not profitable operation can be expected, the qualifications of stockholders such as Butler, Oshman, Rupley and the others, their known successes in financial operations comprising many decades (many of these operations consisting of successful ventures in banking) is certainly good evidence that the proposed venture will succeed.

■ Under the facts of this case we hold that the mere sufficiency of existing banking facilities, in the sense of some facilities more or less appropriately located in area and furnishing the usual gamut of services, is not in and of itself sufficient basis to deny establishment of

the proposed bank where the general economy of the area and its reasonable potential are such that there is room for further installation without causing excessive competition with real harm to any nearby banks now existing or unduly affecting banking structure at large. In addition, we hold that there was substantial evidence to uphold the action of the Banking Board in finding, in addition to the other requirements of the statute, that a public necessity exists for the proposed bank and that the volume of business in the community where such proposed bank is to be established is such as to indicate profitable operation of the proposed bank.

The judgment of the Trial Court is affirmed.

Affirmed.