**FIRST NATIONAL BANK, GRAPEVINE, Appellant,**

v.

**STATE BANKING BOARD of Texas et al., Appellees.**

**No. 11535.**

Court of Civil Appeals of Texas.

Austin.

Oct. 18, 1967.

Rehearing Denied Nov. 8, 1967.

Clark, Thomas, Harris, Denius & Winters, Conrad Werkenthin, Mary Joe Carroll, Austin, for appellant.

Crawford C. Martin, Atty. Gen., George M. Cowden, First Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., Sam Kelley and Charles M. Bardwell, Asst. Attys. Gen., Brady Drake & Wilson, Edward J. Drake, Dallas, McGinnis, Lochridge, Kilgore, Hunter & Wilson, Joe M. Kilgore, James W. Wilson, Shannon H. Ratliff, Austin, for appellees.

PHILLIPS, Chief Justice.

This is an appeal from an order of the State Banking Board approving an application for charter of a state bank to be located in Grapevine, Texas and to be called the American Bank of Commerce.

Appellant First National Bank of Grapevine filed suit in the District Court [1] seeking to set the order aside. The trial court entered judgment upholding the order, hence the appeal to this Court.

We affirm.

Appellant is before us on four points of error, briefed together, namely: the error of the trial court in holding that there was substantial evidence to support the Banking Board's finding that a public necessity existed for the proposed bank, that the volume of business in the Grapevine community was such as to indicate profitable operation of the proposed bank, that the proposed officers and directors of the bank have sufficient banking experience, ability and standing, to render success of the proposed bank probable; and lastly, the error of the court in failing to apply the rules of substantial evidence as applied in appeals from other administrative decisions.

We overrule these points.

1. Suit was filed pursuant to the provisions of Chapter 1, Article 15 of the Banking Code of Texas, Article 342–115, Vernon's Ann.Civ.St.

This case involves the question of whether the order of the Banking Board should stand or fall after the record, as made in the District Court and taken as a whole, is viewed in the light of the substantial evidence rule. Phillips v. Brazosport Savings and Loan Ass'n, 366 S.W.2d 929, (Tex.1963).

The elements of the case to which the substantial evidence rule applies are the mandates found in that portion of the Banking Code codified in Tex.Rev.Civ. Stat.Ann. as Article 342–305, the pertinent portions of which are: "In considering any such application, the State Banking Board shall, after hearing, determine whether or not, a public necessity exists for the proposed bank, the proposed capital structure is adequate, the volume of business in the community where such proposed bank is to be established is such as to indicate profitable operation of the proposed bank, the proposed officers and directors have sufficient banking experience, ability and standing to render success of the proposed bank probable, the applicants are acting in good faith. Should the State Banking Board determine any of the above issues adversely to the applicants, it shall reject the application."

There is an extensive trial record before this Court. The statement of facts contains 940 pages and there are numerous exhibits. The sole obligation of this Court, under the law, is to view this record, keeping the abovementioned legislative directive in mind and to ascertain whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as that of the Banking Board, *Phillips,* supra. If so, the order will stand; if not, it must fall. It is not our prerogative to substitute our judgment for that of the Banking Board even though the evidence before the court preponderates against the order. Board of Firemen's Relief and Retirement Fund Trustees of Houston v. Marks, 150 Tex. 433, 242 S.W. 2d 181, 27 A.L.R.2d 965 (1951).

After reviewing this record, we hold that the order is supported by substantial evidence. State Banking Board v. Airline National Bank, 398 S.W.2d 805 (Tex. Civ.App., Austin, 1966, writ ref'd n. r. e.); Chimney Rock National Bank of Houston v. State Banking Board, 376 S.W.2d 595 (Tex. Civ.App., Austin, 1964, writ ref'd n. r. e.).

Until the American Bank of Commerce was chartered, appellant was the only bank in Grapevine. There is little doubt that the law favors competition in banking. Gerst v. Nixon, 411 S.W.2d 350 (Tex. 1966); Airline National Bank, supra. Evidence developed in support of the order indicated that there was enough banking business in the general area to support another bank under the guidelines of Airline and Chimney Rock, supra. There is no substantial testimony in this record that the new bank would not operate profitably, that the existing bank would be unduly harmed or that the new bank would cause any "greater harm than any newly competing business will naturally inflict upon its neighbors in a similar enterprise. This evidence did not show any possible harm of such a nature as to endanger existence of the nearby banks. * * *" Chimney Rock, supra. The evidence discloses that there would be no harm other than the natural erosion of business due to healthy competition.

Mr. D. D. Patterson, President of the new Grapevine Bank, testified that when he first studied the possibility of a new bank in Grapevine, he consulted the Texas edition of the Southwestern Bank Directory. He stated that in his experience when there is only one bank in a community of any size, an appreciable part of the bank business is leaving town. He discovered that the appellant had deposits in excess of six million dollars. Mr. Patterson prepared two exhibits, one, listing cities in Texas with a population of 6000 or less (the approximate population of Grapevine) with more than one bank. This exhibit shows that there are thirty-eight cities with more

than one bank operating on total deposits of from three to ten million dollars. Another exhibit lists twenty-six towns in Texas with a population of six thousand or less where two or more banks are operating on combined deposit of less than seven and one half million.

There was, quite naturally, a sharp division of opinion between the parties as to what type of new business the new bank would acquire. Appellant contended that the bulk of this new business, if acquired, would, of necessity, be business presently belonging to it. Proponents of the new bank pointed out that the population of Grapevine had increased from 2800 in 1960 to approximately 6000 in 1966; that the average family income had increased from $5,426 to $5,800 during the same period of time. Evidence was also presented that, although the appellant bank had grown, it had not kept pace with the growth in population and aggregate family income. This was demonstrated by charts showing that while in the two years, from 1964 to 1966, population increased some 18% and that during this same period aggregate family income increased around 22%, bank deposits in appellant bank increased only 10%. Further evidence was adduced to show that this rate of growth on the part of appellant is at a lower rate than comparable small banks in the area. It is interesting to note that even with this lesser growth, evidence was presented that the income of appellant bank was twice that of comparable banks in its Federal Reserve District. It was the opinion of Dr. John L. Wortham,[2] principal witness for the new bank, that this high income level is due to lack of competition in Grapevine and not to management.

In addition to the foregoing, additional evidence in support of the order consisted of a poll taken in Grapevine which indicated a certain amount of dissatisfaction with appellant bank; a business survey of twenty-nine established businesses in the community, representing a fair cross-section, disclosed that nineteen out of the twenty-nine businesses were dissatisfied with the existing bank. Of this nineteen, seventeen stated that they definitely would do business with the new bank. A "Flow of Funds" study was made that found, first, that a substantial number of out of town checks were being cashed in Grapevine; and, secondly, an analysis of the Grapevine Water Department Records from June 1 through 10, 1966 revealed that over 30% of the checks given the Grapevine Water Department were drawn on banks outside of Grapevine. This latter study is certainly evidence of a substantial nature indicating that a substantial amount of banking business is leaving Grapevine. In addition, evidence was presented of eighteen residential subdivisions started in Grapevine since 1961, seven major manufacturing firms that have moved in since this time, four of which have either doubled or tripled in size. There is evidence that in 1961 land in Grapevine was selling for between $400 and $800 per acre. That land sold for more than $1000 per acre in 1964 and 1965. That after news of the new airport was announced, land prices more than doubled. That there are 160 shareholders in the new bank and there has been such a demand for the bank stock that it has been necessary to ration the stock. Some families have requested as much as 800 shares; however, subscriptions had to be limited to 200 shares per family and 140 shares per individual. Directors have been limited to 1000 shares. In addition, an attempt was made to restrict ownership of stock to persons with some connection or business interest in Grapevine. Further, it was pointed out that such a demand for stock indicated a wide acceptance of the new bank and a belief in its financial success.

2. Dr. Wortham holds an M.A. degree in economics and a Ph.D. in statistics from the University of Texas. He does consulting work in economics and statistics with two other members of the Texas Christian University's economics department under the firm name of Economic Research Associates.

The evidence summarized to this point has dealt with conditions as they pertain to present day Grapevine; however, there are additional factors of imminent future developments that bear on the feasibility of a second bank in the community with additional readily available capital for developments that can reasonably be expected in the immediate future.

The impact of the construction of the Dallas-Fort Worth Regional Airport was given special consideration by Dr. Wortham and his associates. The economic benefits of the airport construction went beyond the activity which will occur when flight operations begin. The purchase of 12 to 18 thousand acres of land at $1,000 per acre or more will produce a great amount of money, much of which will be seeking capital investment in the Grapevine area. There was evidence that the construction phase will bring a large number of well-paid construction workers to the Grapevine area who in turn will require services. It is anticipated that the construction phase will last approximately ten years, but that flight operations will begin at the airport before construction is completed. It can reasonably be expected that construction of support highways, service stations, motels and other peripheral activities will be constructed in the vicinity of the airport.

Appellant, on the other hand, has vigorously contested the evidence delineated above. Its position, broadly taken, is that Grapevine is a stagnant community with a population less than that indicated above and with doubtful growth potential. That the growth in population resulted from an extension of the city limits rather than actual growth of the community itself. This was further reflected in a house to house count made by a witness for appellant, a check of postal deliveries, telephone connections and electrical connections and new building permits. From these studies appellant placed the population of Grapevine itself at 4,400 for 1966, the Grapevine telephone exchange area for the same period at

6,291 while the Grapevine Post Office area was placed at 8,004. That the town does not have such services as Kress Stores or Woolworths, Sears or Montgomery Ward. That there is no reason for the community to draw to itself from the surrounding area the number of people required to make the second bank a success. That a study of building permits of eight towns surrounding Grapevine placed Grapevine at the bottom in both residential and non-residential permits. That the reason for lack of development is that Grapevine is too far removed from Dallas-Fort Worth traffic compared with other areas around Dallas and Fort Worth.

Appellant presented further testimony that in the area covered by the telephone exchange in and around Grapevine there were only 189 total businesses as of 1966. While 113 had opened between 1960 and April of 1966, 90 had closed leaving an actual increase of 23. That a net of only one new business opened between April of 1965 and April of 1966. That in 1966 Grapevine had exactly the same number of service stations that the town had in 1960. That of the eight towns surrounding Grapevine, Grapevine was at or near the bottom in both residential and non-residential construction for each year from 1960 through the first eight months of 1966.

Further testimony was presented by appellant to the effect that it is generally known as a full service bank doing a complete range of loan business, accepting deposits both on a time and on a demand basis, handling certificates of deposit and maintaining a drive-in facility. Appellant serves most of the businesses in the community. There were 189 business establishments in Grapevine in September 1966. Only 43 businesses within a five mile area within the telephone exchange which includes Grapevine did not bank with appellant.

With respect to the surveys presented by proponents of the new bank concerning the dissatisfaction of some citizens and businesses in Grapevine with the services of-

fered by appellant, appellant after having made a study of these surveys, presented testimony that some of the persons interviewed did not answer the questions correctly. Some answered that they had banked or were banking with appellant where appellant's own records proved to the contrary. That certain dissatisfied customers were shown to have unsatisfactory credit ratings, to have written checks without 'sufficient funds on deposit and had sought loans without collateral. In addition, Dr. John R. Stockton,[3] a witness for appellant, testified that the surveys were mere speculation and unreliable in that they called for opinions rather than facts as to existing conditions.

In addition, appellant attacked the evidence offered by the proponents of the new bank that the Airport would increase the population and business activity of the community. In this respect it was pointed out that the Amon Carter Airport in Fort Worth, Dulles in Washington, D. C. and others had not attracted any considerable amount of activity to their peripheries consequently there was no reason to believe that the Dallas-Fort Worth Airport would do any better.

With respect to competition, appellant pointed out that persons living in the Grapevine area have a wide choice in the banking facilities available to them. That it is only nine minutes driving time to either of the two banks in Euless; eleven and thirteen minutes to the two banks in Lewisville; and fourteen minutes to the bank in Richland Hills.

With respect to the qualifications of the proposed officers and directors, it was shown that the man employed as president of the proposed bank, Mr. Patterson, has had previous banking experience, but that he had been in Grapevine only three times prior to the hearing before the Banking Board and only briefly on those occasions.

That he had never resided in the Dallas-Fort Worth area and had acquired his banking experience in New Mexico and Midland, Texas. That at the time of the Banking Board hearing only four of the thirteen directors lived in Grapevine.

It was strongly urged by appellant that there is nothing in Grapevine comparable to the Houston pattern of development reflected by the opinions of this Court in *Chimney Rock* and *Airline*. This observation is correct, however, the evidence presented before the District Court and summarized above, while in no sense presenting a picture of dynamic growth, does present evidence over which reasonable minds could differ as to the question of the necessity for a new bank and the volume of business to indicate a profitable operation guided by qualified officers and directors. This is substantial evidence where, possibly, in *Chimney Rock* and *Airline* affirmance was supported by a preponderance of the evidence. In these cases new banks were sustained in a metropolitan area in which there were already many banks. In the case before us, a second bank is sought in an area dominated by one. As Justice Hughes wrote for this Court in *Airline*:

"[8] There is nothing in either the Constitution or Banking Code of this State imposing, expressly or by implication, a condition that new banks not be organized or located in communities receiving banking service for existing banks. Such a restriction would be monopolistic in nature and would conflict with the express provision of our Constitution condemning monopolies. Art. 1, Sec. 26, Tex.Const.

[9] The dominant purpose of our banking laws is the protection and security of a bank's depositors and creditors as is manifest from the Constitutional provision above quoted. This purpose is

---

3. Professor at University of Texas, Director of the Bureau of Business Research and an acknowledged expert in the field of economic statistics.

served here by substantial evidence reasonably supporting the findings of the Board, and not upset by the Trial Judge, that the volume of business in the community where Northline is to be established is such as to indicate profitable operation of the bank, and that the applicants for the bank charter are acting in good faith. Also, there is substantial evidence to the effect that the opening of Northline will not result in the closing of any existing banks or in their failure to operate at a profit."

The judgment of the trial court is affirmed.

Affirmed.