James O. GERST, Savings and Loan Commissioner of Texas, et al., Appellants,

v.

**OAK CLIFF SAVINGS AND LOAN ASSOCIATION, Appellee.**

No. 11519.

Court of Civil Appeals of Texas.

Austin.

Nov. 1, 1967.

Rehearing Denied Nov. 29, 1967.

Crawford C. Martin, Atty. Gen., George M. Cowden, 1st Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., Sam Kelly and Robert C. Flowers, Asst. Attys. Gen., Austin Thompson, Walker, Shannon & Gracey, Fort Worth, Clark, Thomas, Harris, Denius & Winters, Austin, Wyndall R. Johnson, Fort Worth, for appellants.

Jacobsen & Long, Joe R. Long, Austin, Turner, Rodgers, Winn, Scurlock & Terry, James R. Rodgers, Dallas, for appellee.

O'QUINN, Justice.

Appellee Oak Cliff Savings and Loan Association, domiciled in Dallas County, sought to establish a branch office in Fort Worth, which was denied by order of the Savings and Loan Commissioner January 21, 1966.

Oak Cliff Savings appealed from the order of the Commissioner. The trial in district court, which began September 6, 1966, resulted in judgment for Oak Cliff Savings, entered October 3, 1966. The trial court held the order of the Commissioner "null and void and of no force and effect," and remanded the cause to the Commissioner "for such further proceedings as may be necessary, not inconsistent with" the judgment.

Appellants are the Commissioner, defendant in district court, and six savings and loan associations, intervenors in the case. The intervening associations constitute all of the savings associations having their home offices in Tarrant County. The intervenors have aligned themselves in support of the Commissioner's order of denial.

The appeal to district court was made under Section 11.12, Article 852a, of the Texas Savings and Loan Act, which became effective January 1, 1964. Acts 1963, 58th Leg., ch. 113, sec. 1, p. 269. The trial court, in remanding the application, acted pursuant to Section 11.12(6) of Article 852a. Appeal to this Court is under Section 11.12(7) of Article 852a.

■ We consider it settled law that the same basic standards are set for the approval or disapproval of applications to open branch offices as are set for the granting of an application for a charter. Southwestern Savings and Loan Association v. Falkner, 160 Tex. 417, 331 S.W.2d 917; Falkner v. Gibralter Savings Association, 348 S.W.2d 467, Tex.Civ.App., Austin, writ ref. n. r. e.

■ These cases, it is true, construed Article 881a–2, the savings and loan law repealed with enactment of the present Texas Savings and Loan Act (Article 852a, supra). Under the present statute, as under the prior legislation, no express authority is given for establishment of branch savings and loan offices. We may presume the legislature was aware of these decisions construing the savings and loan act at the time the present law was enacted. 53 Tex.Jur.2d, Statutes, sec. 183, p. 275, and cases cited.

Under Section 2.08 of Article 852a, the Commissioner, before approving a charter, must find certain facts regarding technical prerequisites and that the incorporators are of such fitness and integrity as to justify belief they will conduct an honest and efficient operation and have qualified fulltime management.

The Commissioner must also find that:

"(3) there is a public need for the proposed association and the volume of business in the community in which the proposed association will conduct its business is such as to indicate profitable operation;

"(4) the operation of the proposed association will not unduly harm any existing association."

Pursuant to authority provided under Article 342–114 of The Texas Banking Code of 1943, "general rules and regulations not inconsistent with the Constitution and Statutes of this State" may be promulgated for building and loan associations. The existing rules and regulations were adopted in November, 1963, and became effective January 1, 1964.

Under Section 2.4, chapter 2, of the rules and regulations, "The Commissioner shall approve an application for a branch office" upon finding, from data with the application, evidence adduced at the hearing, and from his official records, that certain specified requirements and conditions are satisfied.

Among the conditions specified are those found in subparagraphs (d) and (f) of Section 2.4. These subsections read:

"(d) the proposed operation will not unduly harm any other association operating in the vicinity of the proposed location;"

\* \* \*

"(f) the proposed location of the additional office is *within the same county* as the principal or *home office of the applying association except* in cases where it appears that the *proposed additional office is to be in a different county* from that in which the principal or home office of the applying association is located *and there is no other association,* either State or Federal, *adequately serving the community* in which such additional office is to be located." (Emphasis added)

After hearing the application in December, 1965, the Commissioner, in an order made January 21, 1966, denied the Oak Cliff Savings application for a branch office to be located at 3526 Bluebonnet Circle, in Fort Worth, Tarrant County. The order of the Commissioner affirmatively shows that he found all requirements and conditions, prescribed by statute and by the rules and regulations, had been satisfied, except three.

The Commissioner found that:

(1) There was "no public need for the proposed branch office" and "the volume of business in the community in which the proposed branch office would conduct its business is not such as to indicate a profitable operation \* \* \*"

(2) "\* \* \* the establishment of the proposed branch office would result in undue harm to existing associations \* \* \*"

(3) "\* \* \* the proposed location of the additional office is not within the same county as the principal or home office or the applicant association, and the community in which such additional office is to be located is being adequately served by savings and loan facilities."

Upon these findings against the application, the Commissioner denied the branch office.

All but the last of these negative findings by the Commissioner were under the statutory requirements in subsections (3) and (4), Section 2.08, of Article 852a. The last finding falls under subsection (f) of Section 2.4 of the rules and regulations.

The Supreme Court, in Gerst v. Nixon, 411 S.W.2d 350 (Tex.1966), construed subsection 5(b), Section 11.12, as written in the Savings and Loan Act of 1963 (Article 852a), to provide that the Commissioner's order must stand or fall "upon the evidence adduced and matters noticed at the Commissioner's hearing." (411 S.W.2d 350, 357, col. 2).

The Supreme Court observed that:

"The substantial procedural change in this rule [Gerst v. Cain, 388 S.W.2d 168, Tex.1965] by the 1963 Act was to make the record of the Commissioner's hearing rather than evidence produced originally in court the basis from which it must be determined if the evidence conclusively required affirmative findings relating to the matters mentioned in subsections (3) and (4) of Section 2.08." (411 S.W.2d 350, 358, col. 2).

Inasmuch as the Commissioner made a negative finding under Section 2.4(f) of the rules and regulations and based his order at least in part on such finding, we believe the question is squarely before us as to whether subsection (f) of Section 2.4 is valid. Appellee Oak Cliff Savings has raised the issue under its counterpoints two and three.

In Gerst v. Jefferson County Savings and Loan Asso., 390 S.W.2d 318, Tex.Civ. App., Austin, writ ref. n. r. e., this Court did not find it necessary to decide whether the requirements of rules for establishment of branch offices are more lenient or more

onerous than the statutory requirements. This Court did express "the opinion that if there is a conflict between the requirements of the statutes and the rules \* \* \* then, to such extent, such rules are void and of no force or effect," with the further observation "that the rules as read or as interpreted cannot supplant the statutes."

■ The requirement of Section 2.4(f) of the rules, referred to in the savings and loan industry as the "county line rule," is a requirement in addition to the statutory requirements enumerated in Section 2.08 of Article 852a. We believe this additional requirement if enforced would increase the burden on an applicant seeking to establish a branch office. A rule that is broader than the statute empowering the making of the rule, or seeks to extend or restrict the statute, cannot be sustained. 2 Am.Jur.2d Administrative Law, sec. 300, p. 126.

As stated in Gerst v. Jefferson County Savings and Loan Asso., supra, "The only authority needed \* \* \* is the statute under which the rules were promulgated. [Article 342–114, Texas Banking Code of 1943]. This statute expressly limited the content of the rules to matters not inconsistent with the Constitution and statutes." (390 S.W.2d 318, 322, col. 2).

In defense of the "county line rule," appellants cite numerous statutes of other states containing restrictions or requirements similar to the requirement or condition found in the rule. This argument is directed to the merit or lack of merit of such laws and does not meet the question of whether an administrative rule can stand if it has no support in the statute or is in conflict with the statute. The cases cited by appellants in support of the rule pertain to construction of statutes and administrative rules. These authorities are not in point because they do not deal with the fate of a rule when it lacks statutory authority or runs counter to the law it purports to implement.

■ The Commissioner erred by including in his consideration the irrelevant factors injected by application of the "county line rule" found in subsection (f) of Section 2.4. The findings of the Commissioner should have been made without regard to the requirement of this rule.

We hold that subsection (f) of Section 2.4 of the rules is invalid and may not be the basis for granting or denying an application for a branch office.

■ It is from the record made before the Commissioner that the courts are required to determine whether the order of the Commissioner is reasonably supported by substantial evidence. Gerst v. Nixon, supra, 411 S.W.2d 350, 357, col. 2. In reviewing the record in this appeal we must determine whether the Commissioner's order was reasonably supported by substantial evidence, exclusive of the findings under subsection (f), Section 2.4, of the rules.

The record shows that Oak Cliff Savings established a full branch operation in Arlington, in Tarrant County, in August, 1956. This application became its second effort to maintain a branch office in Tarrant County.

At the hearing before the Commissioner, in December, 1965, the association's president, John Ingle, testified that at the time Oak Cliff Savings had 436 savings customers in the immediate area of Fort Worth surrounding the proposed new location. The savings of these 436 customers amounted to $2,376,719.74. The association also had in this community 166 loan customers with balances totaling $2,772,142.46.

Ingle testified that in all of Tarrant County, Oak Cliff Savings had 3,776 savings customers whose accounts aggregated $10,923,266.39. The association had loans with 1,280 customers in Tarrant County with balances amounting to $20,003,863.34.

With reference to these customers, Ingle testified that

"Large numbers of these account holders have been customers of the association for many years. Our entry into the Tarrant County market is nothing new. All we really do want to do is establish a physical facility which will enable us to properly serve these people in this area who prefer to do business with Oak Cliff Savings. We have no idea, of course, how many people in this area may want to do business with us. We do know who do business with us, do so at great inconvenience to themselves as our nearest full-service facility is in Arlington at the eastern edge of Tarrant County, some 24.9 miles from our proposed office. We know further that we are literally losing the opportunity to serve many savings customers because of this inconvenience factor. * * * We estimate nearly ninety percent of our new accounts are opened in person and that a large portion of the remaining ten percent open their accounts by mail only because of the distance involved. * * * We know that typical new savings customers have many questions that are best answered by direct conversation across the desk and can unqualifiedly state our service to them is much better when we have an opportunity to talk to them face to face."

It was shown at the hearing that there are six savings and loan associations in Fort Worth, all of them with their principal or home offices in the central business district. As already pointed out, all six of these associations are intervenors in this case, aligned with the Commissioner to oppose Oak Cliff Savings' application for a branch office. The six Fort Worth associations have eight branch offices, six of which are within the city limits. Three of these branch offices are in the "southwest quadrant" of the city in which Oak Cliff Savings seeks to establish its branch office.

The Commissioner had before him a study made of deed of trust filings in Tarrant County during the period of nineteen months immediately prior to the hearing. It was shown that a total of 28,626 loans had been made in this period, but that savings and loan associations had made only 4,586 of these loans, or about sixteen percent of the total.

Oak Cliff Savings in this period made more loans in Tarrant County than any of the six savings associations having their home offices in Fort Worth. The Oak Cliff loans were more than nineteen percent of the 3,656 made by these seven associations.

The following table summarizes this evidence.

| Association: | Loans: |
|---|---|
| Oak Cliff Savings | 712 |
| Mutual Savings | 686 |
| Fort Worth Savings | 573 |
| Equitable Savings | 485 |
| Tarrant Savings | 482 |
| First Federal | 415 |
| Western Savings | 303 |
| Total loans | 3,656 |

Both Oak Cliff Savings and the intervenors relied heavily upon the testimony of expert witnesses in presenting evidence before the Commissioner.

Witness for Oak Cliff Savings was Dr. Richard B. Johnson, chairman of the department of economics at Southern Methodist University in Dallas, who qualifed as

an experienced consultant in economics, banking, and industry. Dr. Johnson was shown to have specialized in financial and other market analysis work over a period of more than twenty years.

Oak Cliff Savings indicated in its application that the association considered the "southwest quadrant" of Fort Worth the primary potential market for its proposed branch office. The area within a two-mile radius of the proposed location was regarded as its immediate savings market area.

With respect to the market area, Dr. Johnson testified that " * * * the size of the savings and loan markets in the suburbs is not very large. Certainly not five miles; probably not less than three miles in radius, and in my judgment, only intensive for a period of only about two miles."

It was Dr. Johnson's testimony that since the market area for suburban locations is limited to a radius of two to three miles, these branch offices should be placed "with some frequency." Dr. Johnson testified, "Thus, unless you place offices with some frequency in suburban areas and provide intensive office exposure, you provide less convenience and attract less savings than otherwise would occur."

Dr. Johnson testified that this explained why the Dallas savings experience had been better than the experience of Fort Worth, as was shown at the hearing. "If you don't provide the sufficient intensity of office exposure," Dr. Johnson testified, "two things happen: Either they save in alternative offices outside the county or in banks, or even in other institutions than savings and loans or banks, or they don't save. The savings habit is hard to develop, not easy to sustain, and unless you facilitate it, it dwindles away."

The rules governing savings habits, Dr. Johnson testified, are not applicable to the loan market. It was his testimony that "there is a clear distinction between the radius of a savings market and the radius of a loan market. People who are interested in getting credit can get more mobile, can move over wider areas, and have to make the trip only infrequently, anyway. They are not as tied to a location as a saver, not as responsive to convenience expressed in a location."

It was on this thesis that Dr. Johnson testified to major loan market segments from the Fort Worth and Dallas metropolitan areas, using charts, tables, and other exhibits prepared by him and offered in evidence at the hearing. Dr. Johnson testified that "One can think, I believe, of an entire major segment of a metropolitan area as a loan market exposure, but one cannot think of an equivalent large territory as a savings market exposure for an office."

Oak Cliff Savings in support of its application adhered to the theory that while the savings market area might be limited to a radius of two to three miles, the loan market area was more extensive and was a part of the over-all metropolitan growth, economy, planning, and development.

The intervenors, in opposing the application, accepted the theory that the savings market of a branch office will be confined generally to a radius of approximately two miles. The intervening associations contended, however, that the introduction of savings and loan offices from other geographical areas, having a different economy, would be unduly harmful to existing associations.

Witness for intervenors was Dr. Gene Lynch, associate professor of finance at Texas Christian University in Fort Worth. Dr. Lynch was shown to have been teaching a total of eleven years. He qualified as an experienced consultant in matters related to banking and savings and loan institutions.

Dr. Lynch testified that he had made studies and surveys of the "southwest quadrant" of Fort Worth, with respect to the savings and loan industry, and had formed

opinions adverse to the application. Dr. Lynch had the opinion that no public need existed for the proposed branch office, that existing associations were adequately serving the area, and that "the proposed facility would cause undue harm" to other associations operating in the vicinity.

It was the opinion of Dr. Lynch that Fort Worth had become "a relatively static area" not able to support further savings and loan facilities. Dr. Lynch's conclusions based on his studies were expressed in the following testimony:

"Q  Now, before getting specifically into the statistical data, have you arrived at any conclusion based upon your studies concerning Fort Worth and the southwest quadrant and the Bluebonnet two mile circle?

A  Yes, I have.

Q  Briefly, as to Fort Worth, what in a nutshell was your conclusion in that regard?

A  It's growing very slowly. It is a relatively static area.

Q  And as to the southwest quadrant and the two mile radius around Bluebonnet circle, what were your conclusions?

A  The southwest quadrant is also relatively static and growing very slowly. Of course the radius within that area is also growing slowly, except more so.

Q  All right. What was your conclusion regarding the rate of residential construction whether it was increasing or declining?

A  The rate of residential construction is declining.

Q  And what about the age of the area?

A  The area contains large portions of older people, and some other general characteristics of the quadrant and two mile radius are these:

Most of the housing additions are fully developed. A substantial per cent of the homes are deteriorating. The area has an older population compared to the county and the major areas of the city. There is a lack of adequate streets. The area is served by four full service savings and loan facilities in addition to downtown savings and loan offices and by seven neighborhood banks.

Q  Were the areas of growth within the southwest quadrant large portions of it or were they relatively small portions and where were they located?

A  I'm sorry; your question?

Q  Whatever growth has occurred in the southwest quadrant, where have those areas been?

A  The growth has occurred only at the fringes, primarily at the fringes of the southwest quadrant.

Q  And are those relatively large or relatively small portions of the southwest quadrant?

A  Relatively small.

Q  Did you form any conclusions as to whether savings and loan associations need substantial growth in the area that they are operating in?

A  Well, I drew the conclusion that savings and loans need substantial growth and population and new housing to support loan demand. Yes.

Q  Does such growth provide them with new savings customers and new loan customers?

A  Generally economic growth would provide new savings and new homes. Yes.

Q  And population growth?

A  Yes.

Q  And you stated that this is a relatively static area?

A  Yes, it is.

Q  Regarding the Fort Worth economy, did you make any comparative studies of the—pardon me; have you prepared a report?

A  Yes, I have."

The "comparative studies" made by Dr. Lynch and testified to before the Commissioner compared the growth and economy of Fort Worth with Dallas and Houston, and the growth of Tarrant County with Harris, Bexar, and Dallas Counties. The substance of this testimony was that both Fort Worth as a city and Tarrant County as a county showed less growth, and a slower rate of growth, than Dallas and Houston and the counties of Harris, Bexar, and Dallas.

It was shown at the hearing before the Commissioner that the number of persons per bank during the period from 1960 to 1964 had shown comparable reductions in both Dallas County and Tarrant County.

During this same period the number of persons per savings and loan facility in Dallas County had dropped from 32,811 to 24,579. In this period in Tarrant County the number of persons per savings and loan facility had gone from 38,464 to 33,255. It was Dr. Johnson's testimony that an increase of available savings facilities had accounted for the marked reduction of this ratio in Dallas County while the ratio had decreased much less in Tarrant County for the want of such additional facilities.

"In this single metropolitan complex," Dr. Johnson testified, "Dallas-Fort Worth, the east end is served with greater intensity than the west end of the metropolitan area. The west end is consistently served less intensively, and, therefore, with less convenience, and, therefore, generates less savings out of its potential."

It was Dr. Johnson's testimony that "there will be an expanding savings poten-

tial to be tapped by financial offices in Tarrant County; that the rate of growth of savings potential in Tarrant County will be at least as great as that in Dallas County in the next five to twenty years * * * *"

The testimony of Dr. Lynch adduced in behalf of intervenors in support of their contention that Fort Worth's growth and the growth of the "southwest quadrant" may be characterized as "relatively static" is stated in summary by the Commissioner in his order.

The Commissioner pointed out that the "southwest quadrant" in 1960 "had a population * * * of 111,664 persons and had shown a modest growth to 1965 with an approximate population of 118,500 persons, an increase of approximately 1.2 percent per annum."

The Commissioner continued:

"It was established that the southwest quadrant of the City of Fort Worth (including the two mile radius of Bluebonnet Circle) is growing very slow and is substantially a static area. The only areas showing growth were shown to be on the fringe of the southwest quadrant. This was reflected by several economic indicies, such as residential development, school enrollments, telephone utility connections, and postal delivery stops, showing either declines or very modest increases."

Dr. Johnson testified that studies produced by the Texas Highway Department indicated a population increase in Tarrant County of 11.1 percent from 1960 to 1964 and an increase in Dallas County of 18.8 percent during the same years. Projection of population growth showed a growth by 1970 of 32 percent in Dallas County and 31 percent in Tarrant County. The percentage of increase in Tarrant County indicated an increase of 60,000 persons from 1960 to 1964, with a projected increase by 1970 of 185,000 persons in addition to the 60,000 persons.

Testimony regarding building permits in Tarrant County showed a rise from 3,576 living units in 1960 to 6,913 in 1964, with an additional 4,671 such units the first nine months of 1965 prior to the hearing in December. In 1960 residential building permits were valued at about $29,000,000. The value in 1964 was $66,300,000 and $55,500,000 for the first nine months of 1965.

The labor force in Tarrant County rose from 151,849 in 1950 to 207,154 in 1960. The labor force had reached 243,300 by October, 1965, some two months before the hearing. In the fifteen-year period from 1950 to 1965, the labor force increase was accelerated in the last five years. In the first 10 years the increase was 55,300, but in the last five years the increase was 36,100.

The median income per household for Fort Worth was $5,489 in 1960, increasing to $6,307 in 1964. Effective buying income per household in Tarrant County for 1960 was $5,406 and increased to $7,059 in 1964.

During this period savings in savings and loan associations grew at the rate of about $18,000,000 per year.

The primary market proposed to be served in Fort Worth by Oak Cliff Savings was shown to have increased in population from 117,993 in 1960 to 127,028 in 1964. Households in this area increased from 38,293 in 1960 to 46,456 in 1964.

Median income per household in the market area was shown to be higher than the median for Fort Worth as a whole. The market area also showed a greater increase in median income from 1960, when the median was $6,193, to 1964 when it reached $7,122. The increase in Fort Worth as a whole for the same period was from $5,484 to $6,307.

Dr. Lynch testified that the primary market area, sometimes referred to as the "southwest quadrant," contained only twenty percent of the Tarrant County population, but accounted for thirty percent of the savings deposits in the Fort Worth associations from all sources, in or out of the county. It was Dr. Lynch's opinion that the Fort Worth associations had acquired more than $64,000,000 in savings from this market area. Dr. Lynch testified that this market area showed a higher percentage of building permits issued than the city of Fort Worth from 1960 to 1963. This market area was described by Dr. Lynch as "a relatively densely populated area." Dr. Lynch testified, "I think there are probably fewer acres taken up by rivers and tributaries of the Trinity River, perhaps by railroad tracks. I haven't been called upon to make a determination of the relative attractiveness of the area for savings purposes in my study."

Dr. Lynch found that postal delivery stops increased by 1,600 in the primary market area during the two years preceding the hearing, compared with an increase of 2,100 for the four years from 1959 to 1963.

Comparable sectors of Fort Worth and Dallas were examined before the Commissioner through the testimony of Dr. Johnson to demonstrate the disparity between the sectors as to the number of persons exposed to savings and loan offices. In the Fort Worth sector, related to the market area proposed to be served by Oak Cliff Savings, it was shown that there were in 1964 about 40,000 persons per savings and loan office. In Dallas a comparable area had 24,379 persons per office. Dr. Johnson testified that the Fort Worth market area would remain a good market if the ratio were reduced to 15,000 to 20,000 persons per savings and loan office.

It was shown at the hearing that the Fort Worth-Dallas area has been treated by the Texas Highway Department as a single metropolitan region for purposes of establishing the highways pattern. The major arteries of the territory are intercommunications of two central business districts. Concentration of traffic between the two central business districts is placed heavily upon three major connecting routes.

The turnpike count more than doubled between the two cities from 1958 to 1965, and daily crossings of the county line at the time of the hearing were in excess of 75,000 automobiles. Eastbound cars in the turnpike count numbered 1,300,000 and westbound traffic was 1,271,000 cars, a difference of less than 30,000, during the first nine months of 1965.

Dr. Johnson testified that the interconnection between the Fort Worth and Dallas areas was most important in the aspect of financial interrelations. "Maintenance of the mobility of funds within a metropolitan area, or within the country as a whole, is very important," Dr. Johnson testified.

It was Dr. Johnson's testimony that there are three reasons for maintaining mobility of funds: First, to increase savings needed to supply capital for an expanding population and explosive technology; second, movement of capital to aid movement of goods and people; and third, avoiding impediments to financial mobility to help the movement of savings, which come from a wide cross section of income groups.

It was Dr. Johnson's testimony that the area in which Oak Cliff Savings proposed to operate in Tarrant County there was "an underexposure of savings and loan offices relative to the population and income * * * where the growth prospects are so great that rather than creating too many institutions to serve the public * * *" the region was already "in the situation of having too few * * *" Dr. Johnson testified, "I see no problem for Tarrant County as a whole. It is underexposed in savings and loan offices as compared with Dallas, and faces a growth situation which undoubtedly will provide an expanding opportunity to recruit savings and utilize them."

It is apparent from the record that Oak Cliff Savings and intervenors marshalled their witnesses and arranged much of their evidence to meet the issue created by the "county line rule." The Commissioner manifestly based his order in large measure upon findings appropriate only if the requirement of the rule is something the applicant must meet. We have held that the rule is invalid and unenforceable.

On the requirements of law we consider applicable, the Commissioner found (1) no public need, (2) insufficient volume of business to indicate a profitable operation, and (3) that undue harm would result to existing associations.

■ The Supreme Court held in Gerst v. Nixon, supra, that the words "public need" as used in Section 2.08(3) of Article 852a, with respect to savings and loan associations, have the same meaning as "public necessity" as used in the Texas Banking Code of 1943. (411 S.W.2d 350, 358, col. 1). Public need is a substantial or obvious community need for the proposed branch office in the light of attendant circumstances, as distinguished from a mere convenience on the one hand and an absolute or indispensable need on the other. Gerst v. Nixon, supra, citing Chimney Rock National Bank of Houston v. State Banking Board, 376 S.W.2d 595, Tex.Civ.App., Austin, no writ.

■ The testimony of intervenors opposing the application emphasized, by comparison with other Texas cities and other counties, that Fort Worth has not grown in population and in its economy as rapidly as Houston and Dallas, and that Tarrant County has grown at a slower pace than the counties of Bexar, Harris aand Dallas. Dr. Lynch, intervenors' expert witness, characterized the Fort Worth growth as "relatively" static. We believe the conclusions stated by Dr. Lynch that public need was lacking, business was not sufficient for profitable operation, and undue harm would come to existing facilities were not supported by substantial evidence. There was a lack of substantial evidence to support the Commissioner's findings to the same effect.

We believe that a substantial need for the proposed branch office was demonstrat-

ed by all the facts related to the economy of the market area, as well as by population growth, the rise in median income, and the large number of persons in the community in relation to the number of savings and loan facilities. The fact that savings deposits in Fort Worth associations increased $72,000,000 in five years preceding the hearing indicates significant growth and expansion of this industry.

It is undisputed that Oak Cliff Savings has already demonstrated its ability to compete in the Fort Worth market, and in the market area of its proposed location. There is no substantial evidence that the proposed operation will not be profitable or that the volume of business in the community is not such as to indicate success of the proposed operation.

We believe there is no substantial evidence that opening the branch office sought by Oak Cliff Savings would unduly injure existing associations by providing excessive competition. Oak Cliff Savings is already competing with existing associations in the market · sought to be served. For more than a year and a half prior to the hearing Oak Cliff Savings completed more loans in that market than any existing facility. It would appear that the existing services were something less than adequate for this to occur in a market in which such additional business could be developed.

It is obvious from the Commissioner's order that his finding of undue injury to existing associations was based upon application of the "county line rule" to the competitive aspects of the savings and loan industry.

In his order denying the branch office, the Commissioner declared:

"Furthermore, the Commissioner finds that the proposed branch office would result in undue harm to existing associations, and this application seeks to establish a full service branch office facility in an area which is in a different county from the principal or home office of the applicant association, and the community in which such additional office is sought to be located is being adequately served by existing savings and loan facilities."

The Commissioner found that the "county line rule" had "served a valid purpose in restraining over zealous competition."

■ Upon the issue of injury to existing associations, this case is controlled by Gerst v. Cain, 388 S.W.2d 168 (Tex.1965) and Gerst v. Nixon, 411 S.W.2d 350 (Tex. 1966). The lessening of opportunity for existing associations and making it more difficult for them to increase their business are not factors amounting to excessive competition, and therefore undue injury, in this field of competitive enterprise.

We hold that the Commissioner's negative findings are not supported by substantial evidence, and that the evidence so conclusively requires affirmative findings as to make the refusal of the branch office arbitrary and capricious.

The judgment of the district court is affirmed.